UNITED STATES *v.* CELESTINE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WASHINGTON.

No. 235. Argued October 14, 1909.—Decided December 13, 1909.

Although an Indian may be made a citizen of the United States and of the State in which the reservation for his tribe is located, the United States may still retain jurisdiction over him for offenses committed within the limits of the reservation; and so held as to a crime committed by an Indian against another Indian on the Tulalip Indian Reservation in Washington, notwithstanding the Indians had received allotments under the treaties with the Omahas of March 16, 1834, and of Point Elliott of January 22, 1835. *Mat-*

*ter of Heff*, 197 U. S. 488, distinguished, the Indian in that case being an allottee under the general· allotment act of February 8, 1887, c. 119, 24 Stat. 388.

Legislation of Congress is to be construed in the interest of the Indians; and, in the absence of a subjection in.terms of the individual Indian to state laws and denial of further jurisdiction over him by the United States, a statute will not be construed as a renunciation of jurisdiction by the United States of crimes committed by Indians against Indians on Indian reservations. .

The act of May 8, 1906, c. 2348, 34 Stat. 182, extending the trust period of allottees under the act of 1887, suggests that Congress believed it had been hasty in its prior action in granting citizenship to Indians.

AT the May term, 1908, of the Circuit Court of the United States for the Western District of Washington an indictment was found against the defendant, the first count of which reads:

"That one Bob Celestine, an Indian, on the thirtieth day of August, in·the year of our Lord 1906, within the limits of the Tulalip Indian Reservation, within the boundaries of the State of Washington, and within said Western District of Washington, Northern Division, did, with force and arms, make an assault upon one Mary Chealco, an Indian woman, with an axe, which the said Bob Celestine then and there held in his hands, and did then and there feloniously, willfully, knowingly, and with malice aforethought strike, beat, and mortally wound said Mary Chealco with said axe upon the head of the said Mary Chealco, with intent to kill and murder her, the said Mary Chealco, giving to her, the said Mary Chealco, a ·mortal wound upon the head, from which mortal wound said Mary Chealco then and there languished and died, within said Tulalip Indian Reservation, in said Western District of Washington."

The second count is in similar terms, but charges in addition that the Tulalip Indian Reservation, where the offense was committed, is "a place under the exclusive jurisdiction of the United States."

By a special plea the defendant challenged the jurisdiction of the Circuit Court, alleging that at the time of the offense there had been allotted to him as the head of a family certain lands situate on the Tulalip Indian Reservation, within the limits of the State (then Territory) of Washington, under the provisions of the treaty of January 22, 1855, (12 Stat. 927), and in accordance with an executive order of December 23, 1873, and that a patent therefor was issued and delivered to him on May 19, 1885; that he was then a member of the Tulalip tribe of Indians; that ever since that date he "has been and still is a citizen of the United States, and therefore subject to the laws of the Territory and State of Washington;" that he "was born within the territorial limits of the United States, and has always resided within such limits," and that, therefore, he was entitled to "all the rights, privileges and immunities of said citizens of the United States."

This plea also alleged that the murdered woman was a citizen of the United States and the widow of one Chealco Peter, who, like the defendant, had received an allotment of land within the Tulalip Reservation, and a patent thereof similar to that of defendant; that she became entitled to her husband's allotment upon his death, and that the place of the commission of the offense was upon the very land allotted to said Chealco Peter, and without the jurisdiction of the court.

A demurrer by the Government to the plea was overruled and judgment entered sustaining the plea.

A writ of error to this court was then sued out by the United States under authority of the act of March 2, 1907, c. 2564, 34 Stat. 1246.

*Mr. Assistant Attorney General Harr* for the United States:

This case presents squarely for the first time in this court the question whether jurisdiction of the crime of murder committed by an Indian allottee upon allotted land of an

Indian reservation in a State is vested in the state or in the Federal courts. A determination of this question is deemed important, because there should be no uncertainty concerning a matter so vital to the successful punishment of criminals. The Tulalip Reservation was a legally constituted Indian reservation. *Re Wilson,* 140 U. S. 575; *Draper* v. *United States,* 164 U. S. 240.

The United States has authority to define and punish crimes by or against Indians on reservations within the States. *United States* v. *Kagama,* 118 U. S. 375; *Draper* v. *United States,* 164 U. S. 240; *United States* v. *Thomas,* 151 U. S. 577; *Elk* v. *United States,* 177 U. S. 529; *United States* v. *Bridleman,* 7 Fed. Rep. 894; *United States* v. *Martin,* 14 Fed. Rep. 817; *United States* v. *Barnhart,* 22 Fed. Rep. 285.

The United States has not surrendered its criminal jurisdiction over the Tulalip Reservation. *Matter of Heff,* 197 U. S. 488, distinguished.

Exemption from Federal jurisdiction is not to be presumed in absence of clear legislative provision. *Rugles* v. *Illinois,* 108 U. S. 526, 531.

This case lacks the element which in the *Heff case* was declared essential to confer jurisdiction upon the state courts, to wit, a clear Federal legislative provision subjecting the Indians to state laws.

The act of May 8, 1906, 34 Stat. 182, extending to the expiration of the trust period the date when allottees under the act of 1887 shall be subject to the state laws, and omitting any references to allottees under other laws and treaties is significant. It indicates that Congress found it had been too hasty in placing the first-mentioned allottees under the jurisdiction of the State, and that it did not think any extension of time necessary as to allottees under other acts and treaties, because they had not been subjected to state laws.

Citizenship is not inconsistent with continued Federal jurisdiction. *United States* v. *Logan,* 105 Fed. Rep. 240; *United*

States v. *Mullin*, 71 Fed. Rep. 682; *Rainbow* v. *Young*, 161 Fed. Rep. 835; *United States* v. *Rickert*, 188 U. S. 432; *McKay* v. *Kalyton*, 204 U. S. 458; *Beck* v. *Real Estate Co.*, 65 Fed. Rep. 30; *Farrell* v. *United States*, 110 Fed. Rep. 942; *Coombs, Petitioner*, 127 Massachusetts, 278; *State* v. *Denoyer*, 6 N. Dak. 586.

*State* v. *Columbia George*, 39 Oregon, 127, governs this case. Columbia George was tried and convicted in the Federal court. An application by him and Toy Toy, with whom he was jointly indicted, for leave to file a petition for the writ of *habeas corpus*, was denied by this court, 201 U. S. 641. Thereafter a petition by Toy Toy for a writ of *habeas corpus* upon the ground that, as he was a citizen, the Federal court was without jurisdiction, was denied by the Circuit Court and its action affirmed by this court on appeal, 212 U. S. 542.

To hold that the Federal courts are without jurisdiction of such offenses, after the state courts have declined to exercise jurisdiction, might give rise to a serious condition of affairs.

The rule contended for does not deprive the allottee of any of the rights or privileges of citizenship. It is not contended that a limited citizenship is conferred upon allottees, but rather that citizenship is consistent with tribal existence and Indian character. *United States* v. *Real Estate Co.*, 69 Fed. Rep. 886, 891.

The offense in question was committed on an Indian reservation within the meaning of the act of March 3, 1885. *Couture* v. *United States*, 207 U. S. 581; *Eells* v. *Ross*, 64 Fed. Rep. 417, and see *United States* v. *Flournoy Co.*, 71 Fed. Rep. 576; *United States* v. *Mullin*, and *Rainbow* v. *Young, supra*. The conclusion that allotted land is not thereby excepted from a reservation and is still Indian country within the intention of Congress, seems to be the only reasonable and proper one. Otherwise Federal statutes relating to reservations and the Indian country and punishing crimes therein

(Rev. Stat., §§ 2127–2157), would cease to apply, and thus Congress, charged with the duty to protect the Indians, would be held to have abandoned that duty entirely, when in fact it only extended to them the privileges of citizenship.

There was no appearance or brief for the defendant in error.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The fourth paragraph of the act of March 2, 1907, *supra,* authorizes a review of a "decision or judgment sustaining a special plea in bar, when the defendant has not been put in jeopardy." The defendant in this case had not been put upon trial, therefore he had not been in jeopardy. The decision of the Circuit Court sustained the special plea in bar. This fourth paragraph differs from the two preceding, in that the review authorized by them is limited to cases in which "the decision or judgment is based upon the invalidity or construction of the statute upon which the indictment is founded," while no such limitation appears in this paragraph. The full significance of this difference need not now be determined, but clearly the fourth paragraph gives to this court a right to review the precise question decided by a trial court in sustaining a special plea in bar, although that decision may involve the application rather than the invalidity or construction, strictly speaking, of the statute upon which the indictment was founded.

The general provision of the statutes in reference to punishment of the crime of murder committed within the exclusive jurisdiction of the United States is found in chap. 3, Title 70, Rev. Stat., §§ 5339–5391, as amended by the act of January 15, 1897, c. 29, 29 Stat. 487.

Section 9 of the act of March 3, 1885, c. 341, 23 Stat. 385, provides for the punishment of certain crimes by Indians, as follows:

"That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any Territory of the United States, . . . and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

By this section Indians committing against other Indians on a reservation in a State any of the crimes named are subject to Federal laws and tried in Federal courts.

That the offense was committed within the limits of the Tulalip Indian Reservation is distinctly charged in the indictment and not challenged in the plea in bar. Although the defendant had received a patent for the land within that reservation, and although the murdered woman was the owner of another tract within such limits, also patented, both tracts remained within the reservation until Congress excluded them therefrom.

By the second clause of § 3, Art. IV, of the Constitution, to Congress, and to it alone, is given "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." From an early time in the history of the Government it has exercised this power, and has also been legislating concerning Indians occupying such territory. Without noticing prior acts, it is sufficient to refer to that of June 30, 1834, c. CLXI, 4 Stat. 729, the first section of which reads:

"Be it enacted, That all that part of the United States west of the Mississippi, and not within the States of Missouri and

Louisiana, or the Territory of Arkansas, and, also that part of the United States east of the Mississippi river, and not within any State to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country."

Construing this section, it was decided, in *Bates* v. *Clark,* 95 U. S. 204, 209, that all the country described in the act as "Indian country" remains such "so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress." The section was repealed by Rev. Stat., § 5596. Still, it was held that it might be referred to for the purpose of determining what was meant by the term "Indian country" when found in sections of the Revised Statutes which were reënactments of other sections of prior legislation. *Ex parte Crow Dog,* 109 U. S. 556; *United States* v. *Le Bris,* 121 U. S. 278. But the word "reservation" has a different meaning, for while the body of land described in the section quoted as "Indian country" was a reservation, yet a reservation is not necessarily "Indian country." The word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide, and when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress. By the treaty of January 22, 1855 (12 Stat. 927), known as the treaty of Point Elliott, it was provided that certain lands should be reserved for the "use and occupation of the Indians." And, further, article 3, "that the President may establish the central agency and general reservation at such other point as he may deem for the benefit of the Indians." On December 23, 1873, the President established the boundaries of the Tulalip Reservation in the Territory of Washington. The tract sub-

sequently allotted to defendant, as well as that upon which the crime was committed, are within the boundaries prescribed in this executive order. Article 7 of the treaty of Point Elliott authorizes the President to set apart separate tracts within the reservation to such individuals or families as were willing to avail themselves of the privilege and locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable. The treaty with the Omahas, March 16, 1854, (10 Stat. 1043,) provides for the location by an individual or family on land within the Omaha Reservation, its assignment for a permanent home, for the issue of a patent to such person or family, with conditions against alienation or leasing, exemption from levy, sale or forfeiture, not to be disturbed by the State without the consent of Congress; and, further, that if the (p. 1045) "person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned and on which they have located, or shall rove from place to place, the President may, if the patent shall have been issued, cancel the assignment; . . . and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land." The patent issued to the defendant recites that it is issued under the provisions of the article referred to in the treaty with the Omaha Indians.

The plea does not challenge the continued tribal organization of the Tulalip Indians, or question that the tribe, as well as the general body of the reservation, continues under the general care of the United States. Indeed, at the time of the crime the Tulalip Reservation was occupied by 453 Indians, under the charge of an Indian agent. Rep. Com. Ind. Affairs, 1906, pp. 377, 483. Thirteen thousand five hundred and sixty acres have been allotted to 94 of these Indians, and the residue, 8,930 acres, remains unallotted.

Rep. Com. Ind. Affairs, 1908, p. 162. The fact of the patent to Chealco Peter is all that is claimed shows a want of jurisdiction of the United States over the place of the offense, but the conditions of the treaty with the Omahas, made by reference a part of the treaty with the Tulalip Indians, providing for only a conditional alienation of the lands, make it clear that the special jurisdiction of the United States has not been taken away.

*Eells et al.* v. *Ross* (12 C. C. A. 205, Circuit Court of Appeals of the United States for the Ninth Circuit) presented the question of the revocation of a reservation. The treaty with the Puyallup Indians contains like provisions in regard to alienation and forfeiture as are in the treaty with the Omahas.

Circuit Judge McKenna, now Mr. Justice McKenna of this court, in delivering the unanimous opinion of that court, said (p. 207):

"It is not disputed that the lands are a part of those set apart as the Puyallup Reservation, and that the reservation has not been directly revoked; but it is contended that the allotment of the lands in severalty, and afterwards making the Indians citizens, necessarily had the effect to revoke the reservation. There is plausibility in the argument, and it needs to be carefully considered. It is clear that the allotment alone could not have this effect, (*The Kansas Indians*, 5 Wall. 737) and citizenship can only have it if citizenship is inconsistent with the existence of a reservation. It is not necessarily so.

"Some of the restraints of a reservation may be inconsistent with the rights of citizens. The advantages of a reservation are not; and if, to secure the latter to the Indians, others not Indians are excluded, it is not clear what right they have to complain. The act of 1887, which confers citizenship, clearly does not emancipate the Indians from all control, or abolish the reservations."

*Dick* v. *United States*, 208 U. S. 340, does not conflict with

these views, for there the place of the offense was the village of Culdesac, which, although within the boundaries of the Nez Perce Reservation, as at first established, was located upon lands passed by patent from the United States under the townsite laws to the probate judge of Nez Perce County, and by the townsite act such location could only be on public lands. Rev. Stat., § 2380.

But it is contended that although the crime may have been committed on an Indian reservation, yet it does not come within the last sentence of § 9 of the act of March 3, 1885, *supra*, by reason of the fact that both defendant and the woman murdered held patents from the United States, and *Matter of Heff*, 197 U. S. 488, is cited as authority. But there are these important differences between the two cases. In that the person to whom the defendant sold liquor (the charge being that of selling liquor to an Indian) had received a patent under the provisions of the act of Congress of February 8, 1887, known as the General Allotment Act (c. 119, 24 Stat. 388), whereas the patents in this case were issued under the authority of the treaty with the Omahas, March 16, 1854, *supra*, and the treaty of Point Elliott, January 22, 1855, *supra*. It also appeared that the sale was made, not on any reservation, while here the murder was committed within the limits of one.

Section 5 of the act of February 8, 1887, provides (24 Stat. 389) "That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor," etc. Section 6 is as follows (24 Stat. 390):

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its

jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

It will be seen that the first sentence of the latter section, which provides that the allottees shall be "subject to the laws, both civil and criminal, of the State or Territory in which they may reside," applies to allotments and patents made under the authority of that act, whereas the other sentence refers to allotments made under the act of 1887, or under any law or treaty, and in respect to the allottee it is provided only that he "is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens." In other words, so far as the plea is concerned, it is only that Celestine was a citizen of the United States, and entitled to all the rights, privileges and immunities of such citizenship.

We assume, without deciding, that although Celestine was born within the territorial limits of the United States he was not, under the first section of the Fourteenth Amendment, a citizen of the United States prior to the issue of the patent to him; that the jurisdiction of the United States was over the tribe of which he was a member, and not over him personally; so that by the act of 1887 he was given a citizenship in the United States and in the State which did not theretofore belong to him. But, although made a citizen of the

United States and of the State, it does not follow that the United States lost jurisdiction over him for offenses committed within the limits of the reservation. We had occasion in the *Matter of Heff, supra,* to notice the fact that the first dealings with Indians were with them as tribes, but that of late there had been a change in the policy and a disposition to put an end to tribal organization and give to them as individuals all the rights of citizenship, saying (197 U. S. 499):

"Of late years a new policy has found expression in the legislation of Congress—a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the Government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one *sui juris.* And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation, but when that purpose is made clear the question is at an end."

Notwithstanding the gift of citizenship, both the defendant and the murdered woman remained Indians by race, and the crime was committed by one Indian upon the person of another, and within the limits of a reservation. Bearing in mind the rule that the legislation of Congress is to be construed in the interest of the Indian, it may fairly be held that the statute does not contemplate a surrender of jurisdiction over an offense committed by one Indian upon the person of another Indian within the limits of a reservation; at any rate, it cannot be said to be clear that Congress intended

by the mere grant of citizenship to renounce entirely its jurisdiction over the individual members of this dependent race. There is not in this case in terms a subjection of the individual Indian to the laws, both civil and criminal, of the State; no grant to him of the benefit of those laws; no denial of the personal jurisdiction of the United States.

The act of May 8, 1906, c. 2348, 34 Stat. 182, extending to the expiration of the trust period the time when the allottees of the act of 1887 shall be subject to state laws, is worthy of note as suggesting that Congress, in granting full rights of citizenship to Indians, believed that it had been hasty. See, upon the general questions discussed, *United States* v. *Mullin,* 71 Fed. Rep. 682; *Rainbow* v. *Young,* 161 Fed. Rep. 835; *State* v. *Columbia George,* 39 Oregon, 127; *State* v. *Columbia George,* 201 U. S. 641; *Couture* v. *United States,* 207 U. S. 581; *Toy Toy* v. *Hopkins,* 212 U. S. 542.

The judgment is

*Reversed.*