## EUGENE SOL LOUIE v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 6, 1921.)

No. 3380.

Indians ☞38(2)—Federal courts without jurisdiction of crime committed by Indian allottee in fee.

Criminal Code § 328 (Comp. St. § 10502), *held* not to give courts of the United States jurisdiction of the crime of murder committed by an Indian of the Cœur d'Alene tribe against another Indian of the tribe on land to which the defendant has received a patent in fee under Act Feb. 8, 1887, § 5 (Comp. St. § 4201) ; but under section 6 of the act, as amended by Act May 8, 1906 (Comp. St. § 4203), providing that "when the lands have been conveyed to the Indian by patent in fee, as provided in section 5 of this act, then each and every allottee shall have the benefit of, and be subject to the laws both civil and criminal, of the state or territory in which they may reside," the state courts have exclusive jurisdiction of the offense, and it is immaterial that the place where it was committed was within the boundaries of the Cœur d'Alene reservation, in Idaho.

Gilbert, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern Division of the District of Idaho.

Criminal prosecution by the United States against Eugene Sol Louie. Judgment of conviction, and defendant brings error. Reversed.

W. B. McFarland, of Cœur d'Alene, Idaho, for plaintiff in error.

J. L. McClear, U. S. Atty., and J. R. Smead, Asst. U. S. Atty., both of Boise, Idaho.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Louie was tried and sentenced for the murder of Adeline Louie, a Cœur d'Alene Indian and a ward of the United States, in Benewah county, Idaho, alleged to be in an Indian country within the limits of the Cœur d'Alene Indian reservation in Idaho. By writ of error the question presented is whether the United States had jurisdiction of the defendant Louie, plaintiff in error here. Eugene Sol Louie v. United States, 254 U. S. 548, 41 Sup. Ct. 188, 65 L. Ed. —— (January 17, 1921); Id. (C. C. A.) 264 Fed. 295.

The prosecution is based upon section 328 of the Penal Code of 1910 (Comp. St. § 10502), which provides that all Indians committing murder within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory, and shall be tried in the same manner as are all other persons charged with a commission of said crime. The statute provides:

"And all such Indians committing any of the above-named crimes against the person or property of another Indian or other person, within the boundaries of any state in the United States, or within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

It is alleged that Louie was a Cœur d'Alene Indian, who had there-tofore been declared competent by the authorities of the Department of Indian Affairs, and that he was a member of the Cœur d'Alene tribe of Indians, by reason of the fact that he then and there had, in common with all other members of said tribe, an interest in certain tribal funds thereafter to be disbursed to the members of said tribe, including Louie.

Louie held a patent in fee to certain lands in the Cœur d'Alene Indian reservation, and prior to receiving patent held trust patent, the United States holding the land in trust for him. The land patented is within the boundaries of the Cœur d'Alene Indian reservation as the limits thereof were prior to the time the last cession was made. There are no tribal lands on the Cœur d'Alene reservation and all lands that had not been allotted were open to settlement on May 2, 1910. At the time of the assault the victim was living on the land that was patented to Louie. It appears that there were 18,000 acres of land which had never been settled upon and which were included in the cession by the Cœur d'Alene tribe back to the United States; the Indians having an interest in these lands to the extent that they will get the money to accrue from the sale thereof. The land itself, how-ever, is owned by the United States, and is thrown open and platted by white people.

What are called Indian lands now consist of the individual allot-ments in severalty to the members of the tribe and certain townsites on the reservation. By the cession of the 18,000 acres the Indians relinquished their rights to the land and when the patents are issued they are made direct to the purchasers from the United States. Louie has had his share of one distribution already made of the proceeds of sales of part of the 18,000 acres. He lived on the land included in the allotment to him, and had power to rent or sell the land. The patent to Louie was issued under the provisions of the Act of May 8, 1906 (chapter 2348, 34 Stat. 182 [Comp. St. § 4203]), amending section 6 of the Act of February 8, 1887. It provides that at the expiration of the trust period, and when the lands have been conveyed to the Indian by patent in fee, as provided by section 5 of the act (sec-tion 4201)—

"then each and every allottee shall have the benefit of and be subject to the laws both civil and criminal, of the state or territory in which they may reside, and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law: * * * Provided, the Secretary of the Interior may, in his discretion, and he is hereby au-thorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the is-suing of such patent: Provided further, that until the issuance of fee simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States: And provided further, that the provisions of this act shall not extend to any Indians in the Indian Territory." Barnes' Fed. Code, p. 801, § 3598.

In 1887 the United States made a treaty with the Cœur d'Alene Indians, and Congress ratified the same in 1891 (26 Stat. p. 1028), whereunder the Cœur d'Alene Indians ceded all right, title, and claim to large tracts to the United States. By article 5 of the treaty it was provided that, in consideration of the cession and agreements, the Cœur d'Alene reservation—

"shall be held forever as Indian land and as homes for the Cœur d'Alene Indians, now residing on said reservation, and the Spokane or other Indians who may be removed to said reservation under this agreement, and their posterity, and no part of said reservation shall ever be sold, occupied, open to white settlement, or otherwise disposed of without the consent of the Indians residing on said reservation."

In 1906 provision was made for the selling and disposition of unallotted lands in the Cœur d'Alene Indian reservation (34 Stat. p. 335) "to all persons belonging to or having tribal relations on said Cœur d'Alene Indian reservation," and upon approval of such allotments by the Secretary patents were to issue therefor under the provision of the general allotment law of the United States. It was also provided that upon completion of said allotments to said Indians the surplus lands not allotted or reserved for Indian school agency or other purposes of the Cœur d'Alene reservation should be classified as agricultural, grazing, or timber lands, and should be appraised by legal subdivision, and upon completion of the classification and appraisement such surplus land shall be open to settlement and entry under the provisions of the homestead laws at not less than the appraised value, by proclamation of the President.

Section 5 of the Act of Congress of February 8, 1887 (24 Stat. 388), provides that, upon the approval of the allotments provided for by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of 25 years in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs, according to the laws of the state or territory where such land is situated, and that at the expiration of said period the United States will convey same by patent to said Indian or his heirs as aforesaid in fee, discharged of said trust, and free of all charge or incumbrance whatsoever. Inasmuch as patent was issued under the Act of May 8, 1906, amending section 6 of the Act of February 8, 1887, we think that Louie as an allottee became subject to the laws, civil and criminal, of the state in which he resided.

The fact that the land was situate within the limits or boundaries of an Indian reservation is immaterial, because the allottee of the fee-simple patent was expressly declared to be subject to the laws of the state within which the land is situated. This view is strengthened by the fact that the proviso of section 6 (chapter 2348, Act May 8, 1906, the amendatory act heretofore referred to) expressly declares that, until the issuance of fee-simple patents, all allottees to whom trust patents shall thereafter be issued shall be subject to the exclusive juris-

diction of the United States. Such emphatic retention of exclusive jurisdiction until fee-simple patent shall issue brings into relief the equally positive prior declaration that after patent shall have issued the allottee shall be subject to the laws of the state in which he resides.

Counsel for the government cites United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195. There the Indian committed murder within the limits of the Tulalip Indian reservation, and the patent the Indian had received for land was within that reservation. Jurisdiction was challenged upon the ground that when the offense was committed there had been allotted to Celestine certain lands on the Tulalip Indian reservation within the territory of Washington under the provisions of the treaty of January 22, 1855 (12 Stat. 927), and that in accordance with executive order patent had been issued in May, 1885; that the Indian was then a member of the Tulalip tribe and was a citizen of the United States, and therefore subject to the laws of the state of Washington. The court held that, although Celestine had received a patent for the land within the Tulalip Indian reservation, and although the woman he murdered was the owner of another tract within such limits, also patented, both tracts remained within the reservation until Congress excluded them therefrom. The court also held that, although Celestine was made a citizen of the United States and of the state of Washington, it did not follow that the United States lost jurisdiction over him for offenses committed within the limits of the reservation.

Stress was laid upon the fact that, notwithstanding the gift of citizenship, Celestine and the murdered woman remained Indians by race, and that the crime was committed by one Indian upon the person of another and within the limits of the reservation, and that unless there was in terms a subjection of the individual Indian to the laws, civil and criminal, of the state, it should be held that the United States had jurisdiction. The court, however, pointed out that the patents to Celestine and to the murdered Indian woman were issued under the authority of the treaty with the Omahas of 1854 (10 Stat. 1043) and the treaty of Point Elliott of 1855 (12 Stat. 927), and that the first sentence of section 6 of the Act of February 8, 1887, hereinbefore cited, was applicable only to patents made under the authority of the act cited; whereas the sentence to the effect that an Indian born within the territorial limits of the United States to whom an allotment was made under the provisions of the act is declared to be a citizen of the United States, entitled to the rights, privileges, and immunities of such citizen, refers to allotments made under the act of 1887, or under any other law or treaty. The court therefore, held that the plea raised only the point that Celestine had been given a citizenship in the United States, and that it did not follow that the United States had lost jurisdiction over him for offenses committed within the limits of the reservation. The court said:

"There is not in this case in terms a subjection of the individual Indian to the laws, both civil and criminal, of the state; no grant to him of the benefit of those laws; no denial of the personal jurisdiction of the United States."

At once we find a clear distinction between Celestine's Case and Louie's, in that the terms of the statute under which patent to Louie issued have made him "subject to the laws, both civil and criminal, of the state or territory" in which he resides, whereas no such terms are found in the Celestine Case. Congress by its legislation has therefore, in a sense, abandoned its guardianship of Louie and has left him subject to all the privileges and burdens of one sui juris.

We are not unmindful of the general rule that no radical departure of the policy which has prevailed with respect to Indians is intended; but, when the purpose of Congress is made as clear as we think it is by the language to which we have referred, we must give effect to such intent. It results that in the present case the defendant was not subject to the jurisdiction of the United States, and that the judgment against him must be set aside, and the cause remanded, with directions to discharge him.

Reversed.

GILBERT, Circuit Judge (dissenting). It is contended that the offense was not within the jurisdiction of the court below for the reason that the particular parcel of land whereon the crime was committed had been patented in fee simple to the plaintiff in error, and that by the issuance of such patent he had been made subject to state laws under the provisions of the act of 1887 (24 Stat. 390) providing that, upon the patenting of lands to the allottees under that act, every allottee should "have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which he resided," and the amendment of May 8, 1906 (34 Stat. 182), providing that at the expiration of the trust period, and when the lands have been given to the Indians by patent in fee, "then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside."

But the fact that the plaintiff in error had been made subject to state laws does not seem to be the controlling consideration. The real inquiry is: Was the crime committed within the limits of an Indian reservation? If it was, the court below had jurisdiction under the provisions of section 328 of the Criminal Code. The crime was committed within the limits of an Indian reservation, unless the law be that the issuance of a patent in fee to a parcel of land within an Indian reservation of its own force takes the patented land out of the limits of the reservation. Said the court in United States v. Celestine, 215 U. S. 278, 290, 30 Sup. Ct. 93, 97 (54 L. Ed. 195):

"Notwithstanding the gift of citizenship, both the defendant and the murdered woman remained Indians by race, and the crime was committed by one Indian upon the person of another and within the limits of a reservation."

The further language of the court in that case, in which it was said:

"There is not in this case in terms a subjection of the individual Indian to the laws, both civil and criminal, of the state; no grant to him of the benefit of those laws; no denial of the present jurisdiction of the United States"

—is taken by the majority of this court to be an expression of opinion that, if in that case Celestine had received the final patent in fee to .

the land whereon the crime was committed, the United States District Court would have been without jurisdiction. But obviously the learned justice who wrote the opinion, and arguendo made the remarks which are relied upon, did not mean to say that if Celestine had been subjected to the civil and criminal laws of the state, and had been granted the benefit of those laws, the court would have been without jurisdiction. The reverse of that has been held in United States v. Pelican, 232 U. S. 442, 34 Sup. Ct. 396, 58 L. Ed. 676, and Apapas v. United States, 233 U. S. 587, 34 Sup. Ct. 704, 58 L. Ed. 1104, where it was ruled that the federal courts had jurisdiction irrespective of citizenship or race where the crime was committed against a full-blood Indian ward of the government, and was committed upon Indian lands.

I submit that the statute which authorized the conveyance of lands to individual Indians in fee simple is limited by the provisions of section 328 of the Criminal Code, and that, although the patentee of an allotment of such lands is rendered subject to state laws, the jurisdiction of the courts of the United States over offenses committed by such patentee on said allotment is retained so long as the land remains within the limits of an Indian reservation. The limits of the reservation must be taken to be the exterior boundary lines thereof. Within those lines there still remain unpatented allotments. How many the record does not show. It is not to be supposed that Congress intended that jurisdiction within those lines should be divided between federal and state courts.

It would seem that the statute is also to some extent limited by the treaty with the Indians, made in 1887, and ratified by Congress in 1891 (26 Stat. 1028). In article 5 it was stipulated:

"In consideration of the foregoing cession and agreements, it is agreed that the Cœur d'Alene reservation shall be held forever as Indian land, and as homes for the Cœur d'Alene Indians now residing on said reservation, and the Spokane or other Indians who may be removed to said reservation under this agreement, and their posterity, and no part of said reservation shall ever be sold, occupied, opened to white settlement or otherwise disposed of, without the consent of the Indians residing on said reservation."

The Act of 1906 provided for the allotment of lands to Indians in severalty, and that after the allotments were made the remainder should be thrown open to settlement by white people. There has been no treaty abrogating the provisions of the treaty of 1887, except the treaty of 1899, by which a certain town site and a small body of land adjacent thereto were disposed of and opened to white settlement. In Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520, the court especially recognized the binding force of a treaty with the Indians, and held that the Prohibition Act (section 2139, Rev. Stat., as amended in 1892 [Comp. St. § 4136a]), must be interpreted in connection with the special agreement which the United States had made with the Indians in regard to the extinguishment of the title and the retention of control over lands ceded by the United States. And although it may be said that a treaty stands on no higher plane than does an act of Congress, and an act of Congress may repeal a prior

treaty, it is a settled rule of statutory construction that such a repeal by implication is not to be favored, and will not be held to exist if there be any other reasonable construction. Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes