**PETITION OF Reyna Tom CARMEN
for a Writ of Habeas Corpus.
Civ. No. 37037.**

United States District Court
N. D. California, S. D.
Sept. 12, 1958.

Mason A. Bailey, Madera, Cal., Leonard J. Bloom, San Francisco, Cal., for petitioner Rayna Tom Carmen.

Edmund G. Brown, Atty. Gen., Clarence A. Linn, Asst. Atty. Gen., for respondent.

GOODMAN, Chief Judge.

Petitioner is confined at the California State Penitentiary at San Quentin pursuant to a judgment of conviction of murder and sentence of death imposed by the Superior Court of the State of California in and for the County of Madera, on October 30, 1951.[1] By an application for the writ of habeas corpus, he seeks his discharge on the ground that the California Superior Court lacked jurisdiction to try him for the murder of which he was convicted because exclusive jurisdiction to try him for such offense was vested by federal statute in the United States District Court.

The statute relied upon by petitioner is often referred to as the Ten Major Crimes Act[2] and is now incorporated in Sections 1151, 1153, and 3242 of Title 18 of the United States Code. It provides in substance that an Indian who commits any of the ten listed crimes, among which is murder, in Indian Country shall be subject to the same laws and penalties and tried in the same courts as persons committing such crime within the exclusive jurisdiction of the United States. During petitioner's trial in the Superior Court apparently he and his counsel, the prosecution, and the court were all unaware of this statute. There was testimony at the trial indicating that both petitioner and his victim were Indians, but this testimony was given as background information and not for the purpose of questioning the court's jurisdiction. There was evidence that the scene of the crime was the victim's residence, but this evidence did not establish that his residence was in Indian Country.

Upon the automatic appeal from the judgment of conviction and sentence of death, an Assistant United States Attorney appeared before the Supreme Court of California in behalf of the United States and advised the Court that since petitioner and his victim were Indians

---

1. The offense was committed on April 23, 1950. A trial held in June 1950 resulted in a judgment of conviction which was reversed by the California Supreme Court for improper instructions. People v. Carmen, 36 Cal.2d 768, 228 P.2d 281 (March 1, 1951). The judgment under which petitioner is now in custody was entered in a second trial held in October, 1951.

2. As originally enacted in 1885, 23 Stat. 385, this Act dealt only with seven crimes and was then referred to as the Seven Major Crimes Act. In 1909, the crime of assault with a dangerous weapon was included. 35 Stat. 1151. And, in 1932, incest and robbery were added, 47 Stat. 337.

and there was reason to believe the locale of the crime was Indian Country, it appeared that the United States had exclusive jurisdiction to try petitioner. Thereafter the parties filed with the Supreme Court a stipulation that both petitioner and his victim were Indians by race and that the murder had been' committed on an Indian allotment the title to which was held in trust by the United States. On the basis of this stipulation, the Supreme Court found that exclusive jurisdiction to try petitioner was vested by statute in the United States courts, and reversed the judgment of conviction. People v. Carmen, 265 P.2d 900 (Feb. 1, 1954). Upon application by the prosecution, a rehearing was granted.

On rehearing, the Supreme Court found the stipulation inadequate to establish that petitioner or his victim were Indians within the meaning of the Ten Major Crimes Act. It also found the evidence in the trial record inadequate to show that petitioner and his victim were Indians within the meaning of the Act or that the crime occurred in Indian Country. It therefore sustained the jurisdiction of the Superior Court upon the trial record and affirmed the judgment of conviction. People v. Carmen, 43 Cal.2d 342, 273 P.2d 521 (August 17, 1954).

Petitioner then sought to raise the jurisdictional issue by application to the California Supreme Court for a writ of habeas corpus. Upon the filing of this application on November 10, 1954, the Supreme Court issued the writ and appointed a Referee to take testimony and make findings regarding the Indian status of petitioner and his victim as well as the locus of the crime. At the hearings before the Referee it was again stipulated that the crime was committed on an Indian allotment title to which was held in trust by the United States and the petitioner and his victim were Indians by blood. In addition, on the basis of the testimony taken, the Referee found that petitioner and his victim belonged to the Mono tribe of Indians and were listed on the roll of Indians maintained by the United States Department of Interior as members of such tribe. He further found that the tribe maintained a loose tribal organization and followed unique customs and that petitioner and his victim had never severed tribal relations.

After receiving the findings of the Referee, the Supreme Court of California nevertheless disregarded them, because in its opinion the trial court's exercise of jurisdiction could not be contested in a habeas corpus proceeding on the basis of new facts not appearing in the trial record. It therefore discharged the writ of habeas corpus. In re Carmen, 48 Cal. 2d 851, 313 P.2d 817 (August 2, 1957).

During all of these years that the California Supreme Court wrestled with the jurisdictional question, petitioner remained in custody on death row in San Quentin. Upon the adverse ruling on his petition for habeas corpus, he applied to the United States Supreme Court for a writ of certiorari to review the judgment of the California Supreme Court. This application was denied on January 13, 1958 "without prejudice to an application for a writ of habeas corpus in an appropriate United States District Court." Carmen v. Dickson, 355 U.S. 924, 78 S.Ct. 367, 2 L.Ed.2d 354. The application to this Court for the writ followed. An order to show cause was issued and a return was made by respondent. The cause has been argued and briefed by counsel for petitioner and respondent.

■ Respondent intially questions the applicability of the Ten Major Crimes Act. The text of this act as it now appears in the United States Code is as follows:

18 U.S.C. § 1153. *Offenses committed within Indian Country.*

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny within the In-

dian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

18 U.S.C. § 3242. *Indians committing certain offenses.*

"All Indians committing any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny on and within the Indian country, shall be tried in the same courts, and in the same manner, as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

18 U.S.C. § 1151. *Indian country defined.*

"Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

The Indian allotment which was the site of the murder, for which petitioner was convicted, was made from lands in the public domain. Respondent urges that it consequently was not an allotment, the Indian title to which has not been extinguished and thus is not Indian country as defined in the Act. He contends that an allotment, the Indian title to which has not been extinguished, is an allotment from an Indian reservation, or from land of which the Indians have had uninterrupted use and occupancy.

Respondent bases this interpretation of the statute primarily upon his view of its legislative history. The Ten Major Crimes Act as originally enacted on March 3, 1885, 23 Stat. 385, was not applicable to the Indian country generally but only to Indian reservations. But, when the Act was incorporated into the New Criminal Code in 1948, the reach of the Act was extended to all Indian country as defined in Section 1151 of the Code. Section 1151 represented the first attempt to statutorily define the term "Indian Country" since the Act of June 30, 1834, 4 Stat. 729, which had been repealed in 1874 (Revised Statutes § 5596). Section 1151 resulted from the judicial definitions of the term in the intervening years. House Report No. 304, 80th Congress, page 492 states that Indian allotments were included in the definition of Indian Country on the authority of United States v. Pelican, 1914, 232 U.S. 442, 34 S.Ct. 396, 399, 58 L.Ed. 676. In Pelican a murder had been committed on an Indian allotment which had been carved out of an Indian reservation and then excluded from the boundaries of the reservation. The Supreme Court held that so long as the United States held title to the allotment in trust for the Indian allottee it remained Indian country even though the allotment was no longer within the reservation. Respondent interprets the Pelican decision to mean that an allotment to be Indian Country must have been made from lands which were previously Indian Country. But this is an unduly restricted view of that decision. In Pelican the allotment in question had in fact been made from lands that were already Indian Country. But, that decision does not imply at all that this was a necessary prerequisite to the allotment being Indian Country. Indeed, quite the contrary is true. In Pelican, the reservation from which the allotment was made had itself been created out of the public domain rather than from land which had previously been in Indian possession. The Supreme

Court noted that in an earlier decision, Donnelly v. United States, 1912, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, it had held that a reservation set apart out of the public domain was just as truly Indian Country as a reservation created from land which had always been occupied by Indians. The Court then went on to say that: "In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the government. * * * The same considerations, in substance, apply to the allotted lands which, when the reservation was diminished, were excepted from the portion restored to the public domain. The allottees were permitted to enjoy a more secure tenure, and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the government retaining control."

Since all Indian allotments, regardless of their source, are maintained under the same type of Governmental supervision, either by holding title in trust for the allottee or by restricting alienation, there is no logical reason for making the application of protective criminal statutes dependent upon the source of the allotment. But, if there were otherwise any doubt about the matter, there is an aspect of the legislative hist⸗ y of Section 1151, overlooked by respondent, which compels the conclusion that the Congress intended to include in this statutory definition of Indian Country all Indian allotments, *regardless of source,* while in trust or inalienable by the allottee. Prior to 1948 when Section 1151 was enacted, Section 241 of Title 25 of the United States Code made it a criminal offense to introduce intoxicating liquor into the Indian country and provided that such term should include "any Indian allotment while the title to the same shall be

held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States." 52 Stat. 696. In 1948 Section 241 was repealed and the prohibition against introducing intoxicating liquor into the Indian country was incorporated in new Section 1154 of Title 18. But, the provision of the repealed Section 241 that Indian country should include "any Indian allotment while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States," was omitted from the new Section 1154. The Reviser's Note specifically states this portion of repealed section 241 "relating to the scope of the term 'Indian country' was omitted as unnecessary in view of the definitions of 'Indian country' in Section 1151" of Title 18. It is thus clear that when Congress provided in Section 1151 that Indian country should include "all Indian allotments, the Indian titles to which have not been extinguished," it considered this description broad enough to encompass all Indian allotments while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States. The allotment which was the situs of petitioner's offense is then Indian country within the meaning of the Ten Major Crimes Act.

Respondent also questions the applicability of the Ten Major Crimes Act on the ground that petitioner, although an Indian by blood, is emancipated to such an extent that he is not an Indian within the meaning of the Act. None of the decisions relied upon by respondent support this contention. A proper understanding of these authorities requires a picture of the place of the Ten Major Crimes Act in the scheme of federal regulation of the American Indian.

Originally the federal government permitted the Indian tribes considerable governmental autonomy. The tribal autonomy was recognized in the Act of June 30, 1834, 4 Stat. 729, and 733, which

extended the federal criminal laws to the Indian Country, but expressly made them inapplicable to crimes "committed by one Indian against the person or property of another Indian." In 1854, 10 Stat. 270, the federal criminal statutes as extended to the Indian Country were also made inapplicable to Indians committing *any* offense within the Indian country if they were punished by the local law of the tribe.[3] But, as tribal authority diminished through the years and the Indians entered more and more into the life of the non-Indian communities, tribal autonomy in major criminal matters became undesirable. Thus in 1885, the Ten Major Crimes Act (23 Stat. 385) was passed to make the federal criminal statutes applicable to serious crimes committed by Indians on their reservations. The apparent effect of these federal statutes was to divide the jurisdiction over crimes committed by Indians in Indian Country between the federal government and the Indian tribes. However, some state courts recognized a small area of state jurisdiction by holding that an Indian who was not a member of any tribe was subject to state criminal jurisdiction even for offenses committed in the Indian country. Three of the decisions relied on by respondent so hold. Two of these decisions,[4] however, deal with offenses not enumerated in the Ten Major Crimes Act. Thus they are not direct authority for the proposition that non-tribal Indians are not Indians within the meaning of that Act. The third case, State v. Howard, 1903, 33 Wash. 250, 74 P. 382, does hold that an Indian who is not a member of any tribe is not an Indian subject to the Ten Major Crimes

Act. But, in so holding it stands alone.[5] Its authority is weakened by the decision of the United States Court of Appeals for the Ninth Circuit in Davis v. United States, 1929, 32 F.2d 860, which appears to stand for the proposition that tribal relations have no bearing on an Indian's status as an Indian within the meaning of the Ten Major Crimes Act. But whether or not Howard represents the correct interpretation of the term "Indian" as used in the Act, it is factually inapplicable to petitioner, since Petitioner has been found to be a member of the Mono tribe.[6]

On February 8, 1887, two years after the passage of the Ten Major Crimes Act, the Congress enacted the Dawes General Allotment Act, 24 Stat. 388, 25 U.S.C.A. § 348, which provided for the allotment of lands in severalty to Indians with the title held in trust for twenty five years. The Act specified that upon the completion of such allotment, the allottee should "have the benefit of and be subject to the laws, both civil and criminal, of the State" where he resided. 25 U.S.C.A. § 349. In 1906, the Dawes Act was amended to make it clear that the allottee should not be subject to state law until the trust period expired and he received a fee patent. 34 Stat. 182.

As additional authority in support of the argument that petitioner is an emancipated Indian not subject to the Ten Major Crimes Act, respondent cites a decision by the Court of Appeals for this circuit [7] and a decision by the Supreme Court of Montana [8] holding that an Indian who has received a fee pat-

3. These statutory provisions are now incorporated in Section 1152 of Title 18 of the United States Code.

4. People ex rel. Schuyler v. Livingstone, 1924, 123 Misc. 605, 205 N.Y.S. 888; State v. Campbell, 1893, 53 Minn. 354, 55 N.W. 553, 21 L.R.A. 169.

5. Respondent also cites People v. Ketchum, 1887, 73 Cal. 635, 15 P. 353, which held a non-tribal Indian could be tried in the State courts for murder. But it does not appear in that case that the mur-

der was committed on a reservation or elsewhere in Indian Country.

6. It was agreed that the evidence adduced at the hearing before the Referee appointed by the Supreme Court of California might be considered as though received in this proceeding.

7. Eugene Sol Louie v. United States, 9 Cir., 1921, 274 F. 47.

8. State v. Monroe, 1929, 83 Mont. 556, 274 P. 840.

ent to land allotted under the Dawes Act is no longer subject to the Ten Major Crimes Act. There are decisions of the United States Supreme Court which, while not directly contrary, make these decisions questionable.[9] But, right or wrong, they are factually irrelevant inasmuch as petitioner has never received an allotment under the Dawes Act.

Respondent has cited no cases, and there appear to be none, which suggest any method of emancipation which might except an Indian from the provisions of the Ten Major Crimes Act, other than the severing of all tribal relations or the obtaining of a fee patent to land allotted under the Dawes Act. Whether or not non-tribal Indians or Indians holding a fee patent to land allotted under the Dawes Act are subject to the Ten Major Crimes Act is unnecessary to decide. For there is no doubt that petitioner, who has received no allotment and is an Indian by blood, enrolled as a member of the Mono tribe by the Bureau of Indian Affairs, is an Indian subject to that Act.

Respondent next contends that the Ten Major Crimes Act does not vest the federal courts with exclusive jurisdiction over the offenses enumerated in the Act, but only grants jurisdiction to be exercised concurrently with the State courts. This contention is wholly untenable. The language of the Act which specifies that Indian offenders subject to the Act "shall be tried in the same courts, and in the same manner, as are all other persons committing any of the above crimes within the exclusive jurisdition of the United States" clearly contemplates that Indian offenders shall be tried exclusively in the federal courts. There are many cases that so hold,[10] and none which hold to the contrary.

Respondent's final contention in respect to the Ten Major Crimes Act is that the Act is unconstitutional if interpreted to vest the federal courts with exclusive jurisdiction over the murder committed by petitioner. In United States v. Kagama, 1886, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228, the constitutionality of the Ten Major Crimes Act was upheld on the theory that the Indians are a dependent people within the limits of the United States who must of necessity be the wards of the national government. Respondent suggests that United States v. Kagama is obsolete. He urges that the wardship theory can not sustain the constitutionality of the Ten Major Crimes Act as applied to a crime on an allotment from the public domain and to an Indian offender, who is a citizen of the United States and the State of California, who lives where he pleases unsupervised by any federal agency and who is entitled to educational facilities, welfare services, and other benefits supplied by the State of California.

But, the Supreme Court of the United States has consistently rejected all arguments that Federal power to regulate the Indians has diminished as federal control has been relaxed. Thus the Court has held that the grant of national and state citizenship to the Indians in no way altered their status as wards of the Federal government.[11] The Court has repeatedly stated that it rests with the Congress to determine when and how the national guardianship shall be brought to an end, and whether the emancipation

9. See Rice v. Olson, 1945, 324 U.S. 786, 790–791, 65 S.Ct. 989, 89 L.Ed. 1367, and the cases there cited.

10. See e. g. Ex parte Pero, 7 Cir., 1938, 99 F.2d 28; Yohyowan v. Luce, D.C.1923, 291 F. 425; State v. Pepion, 1951, 125 Mont. 13, 230 P.2d 961; State v. Columbia George, 1901, 39 Or. 127, 65 P. 604; People ex rel. Cusick v. Daly, 1914, 212 N.Y. 183, 105 N.E. 1048; State v. Condon, 1914, 99 Wash. 97, 139 P. 871;

Ex parte Cross, 1886, 20 Neb. 417, 30 N.W. 428; State v. Campbell, 1893, 53 Minn. 354, 55 N.W. 553, 21 L.R.A. 169.

11. Board of Commissioners of Creek County v. Seber, 1943, 318 U.S. 705, 718, 63 S.Ct. 920, 87 L.Ed. 1094; Tiger v. Western Investment Co., 1911, 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738; United States v. Celestine, 1909, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195.

shall at first be complete or only partial.[12]

In 1953, subsequent to the offense committed by Carmen, the Congress did substantially curtail the Federal guardianship over the California Indians by granting the State of California criminal and civil jurisdiction over Indians within all of the Indian Country in the State, subject to limited exceptions. 67 Stat. 588. This action was taken by the Congress only after careful study.[13] It would certainly be presumptuous of this Court to substitute its judgment for that of the Congress and hold that this action should have been taken sooner, and that Congressional power to assert criminal jurisdiction over the California Indians had previously expired. Respondent's contention that the Ten Major Crimes Act is unconstitutional as applied to petitioner cannot be sustained.

■ There remains the question whether the lack of jurisdiction in the State court can be entertained in this habeas corpus proceeding inasmuch as the test of the state court's jurisdiction requires consideration of some facts dehors the trial record. The decisions of the United States Supreme Court, defining the scope of the inquiry that may be made in a habeas corpus proceeding, leave no doubt that this Court has the power to consider the jurisdictional issue. In Frank v. Mangum, 1914, 237 U.S. 309, at page 331, 35 S.Ct. 582, at page 588, 59 L.Ed. 969, the Court said, "There being no doubt of the authority of the Congress to thus liberalize the common law procedure on habeas corpus in order to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution or a law or treaty established thereunder, it results

that under the sections cited a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to judgment against him." See also, Mooney v. Holohan, 1935, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543.

The Supreme Court of California, in refusing to consider the jurisdictional issue here tendered upon petitioner's application for the writ of habeas corpus, noted that these decisions of the United States Supreme Court considering facts dehors the trial record involved claimed denials of fundamental constitutional rights. This, said the California Supreme Court, distinguishes those cases from the present case where the claim of want of jurisdiction is based on petitioner's status and the locus of the crime. In re Carmen, 48 Cal.2d 851, 859, 313 P.2d 817. Implicit in this attempted distinction is the suggestion that a claim of lack of jurisdiction because of a violation of a constitutional right is of greater consequence than a claim of the wrongful assumption of jurisdiction in violation of a federal statute. But, the federal habeas corpus statute, which was interpreted by the United States Supreme Court, makes no distinction between violations of constitutional rights and violations of rights accorded by statute. It extends the writ of habeas corpus to all cases of persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241.

---

12. Board of Commissioners of Creek County v. Seber, 1943, 318 U.S. 705, 718, 63 S.Ct. 920, 87 L.Ed. 1094; United States v. Nice, 1915, 241 U.S. 591, 598, 36 S.Ct. 696, 60 L.Ed. 1192; Tiger v. Western Investment Co., 1910, 221 U.S. 286, 310 et seq., 31 S.Ct. 578, 55 L.Ed. 738; Perrin v. United States, 1913, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691; United States v. Sandoval, 1913, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107; United States v. Rickert, 1903, 188 U.S. 432, 445, 23 S.Ct. 478, 47 L.Ed. 532.

13. See House Report 848, 83rd Congress, 1st Session, 1953 U.S.Code Congressional and Administrative News, p. 2409.

Respondent cites a number of federal cases in which the Court in a habeas corpus proceeding declined to consider a jurisdictional question dependent upon facts dehors the record. One of these cases, Rodman v. Pothier, 1924, 264 U.S. 399, 44 S.Ct. 360, 68 L.Ed. 759, is irrelevant because there the jurisdictional issue was raised by petition for habeas corpus before trial. Another, In re Lincoln, 1906, 202 U.S. 178, 26 S.Ct. 602, 50 L.Ed. 984, is of no value because it dealt with an attempt to secure direct review of a judgment of conviction by the United States Supreme Court by petition for the writ of habeas corpus in avoidance of the normal appellate process. In the remainder of the cases cited by respondent,[14] the facts dehors the record alleged in support of the claim of want of jurisdiction were inconsistent with jurisdictional facts alleged in the indictment. In the present case, the absence of jurisdiction in the State court is evidenced partially by the trial record and partially by new facts in no way inconsistent with any facts alleged in the information or found by the court.

In Ex parte Van Moore, D.C.1915, 221 F. 954, a case strikingly similar to this one, the United States District Court for South Dakota, upon a petition for habeas corpus, considered facts outside the trial record in holding the Circuit Court of the State of South Dakota lacked jurisdiction to try an Indian for a murder committed upon an Indian allotment. In Ex parte Pero, 1938, 99 F.2d 28, another similar habeas corpus proceeding, the Court of Appeals for the Seventh Circuit also appears to have looked to facts dehors the record in holding that the State of Wisconsin was without jurisdiction to try an Indian for a murder committed on a reservation within the State.

But, respondent urges that even if it be conceded that this Court has the power in this proceeding to look to facts outside the trial record to test the jurisdiction of the State court, the exercise of this power is proper only upon a showing of exceptional circumstances. However one might characterize the circumstances in this case, they clearly warrant the exercise of this Court's power to inquire into the jurisdiction of the State court.

■ The testimony at petitioner's trial was that both he and his victim were Indians, and that the murder occurred at the victim's residence. Although these facts alone did not fully demonstrate the lack of jurisdiction in the trial court, they should have put the State Court on inquiry as to its own jurisdiction. The right to be tried in a Federal Court accorded petitioner by the Ten Major Crimes Act, was not a mere procedural right, waived unless asserted. It could not have been waived even by express agreement. The Ten Major Crimes Act was enacted for the protection of the Indian wards of the United States. Both the trial court and the state's attorneys had a duty to uphold this federal statute. They had a responsibility to see to it that the court did not improperly assume jurisdiction over an Indian ward of the Federal government.

When the matter came to the attention of the United States, its representative promptly advised the California Supreme Court of the jurisdictional question while the appeal was pending. The stipulation of the parties that petitioner was an Indian by blood, and that the locus of the crime was an Indian allotment, the title to which was held in trust, constituted at the least a prima facie showing of the lack of jurisdiction in the State court. If, in the opinion of the California Supreme Court, the exclusive federal jurisdiction also depended upon the fact that petitioner was a tribal Indian and had not received a fee patent to an allotment under the Dawes Act, these were facts which were a matter of public record and easily ascertainable. They were in fact

14. Toy Toy v. Hopkins, 1909, 212 U.S. 542, 29 S.Ct. 416, 53 L.Ed. 644; Davis .v. Johnston, 9 Cir., 1944, 144 F.2d 862; Hatten v. Hudspeth, 10 Cir., 1938, 99 F.2d 501; Walsh v. Johnston, 9 Cir., 1940, 115 F.2d 806; Walsh v. Archer, 9 Cir., 1934, 73 F.2d 197; Ex parte Savage, C.C.Kan., 1908, 158 F. 205.

ascertained by the Referee appointed by the California Supreme Court upon petitioner's application for the writ of habeas corpus, which was promptly presented to that court after his unsuccessful appeal. Yet the California Supreme Court deemed itself powerless to remedy an assumption of jurisdiction clearly in violation of a federal statute.

Under these circumstances, it becomes the plain duty of this Court to protect the jurisdiction vested in the Federal Courts by the Ten Major Crimes Act.

It appears from respondent's return to the order to show cause, that in the trial in June 1950 in which petitioner was originally convicted of murder, he was also tried and convicted for assault with intent to murder. Although the judgment of conviction of murder entered in that trial was reversed for improper instructions, the judgment of conviction of assault with intent to murder was affirmed on appeal, People v. Carmen, 36 Cal.2d 768, 228 P.2d 281 (March 1, 1951) and is still outstanding.

Petitioner's application for the writ of habeas corpus directly challenges only the judgment of conviction for murder in his second trial for that offense. And, in their argument and briefs the parties concerned themselves solely with that judgment. But, inasmuch as petitioner's application seeks his discharge from custody and respondent has asserted in his return to the order to show cause the judgment of conviction of assault with intent to murder as a bar to this relief, the validity of that judgment has been put in issue in this proceeding. Certainly in view of the inordinate amount of time that the state court's jurisdiction over petitioner has been in controversy, it is imperative that the remaining question of its jurisdiction to try petitioner for assault with intent to murder be promptly disposed of in this proceeding.

Assault with intent to kill is one of the crimes which the Ten Major Crimes Act places within the exclusive jurisdiction of the federal courts when committed by an Indian in Indian country. It appears from the opinion of the California Supreme Court affirming the judgment of conviction of assault with intent to murder that the assault was committed at the same place as the murder and the record in the case so shows. The Superior Court in and for the County of Madera therefore lacked jurisdiction to try petitioner for that offense.

The writ of Habeas Corpus will issue and it is Ordered that petitioner be discharged from custody.