COEUR D'ALENE TRIBE OF IDAHO, Nez Perce Tribe; Shoshone–Bannock Tribes, Plaintiffs–Appellees,

v.

Duwayne D. HAMMOND, Jr.; Coleen Grant; Larry Watson; Severina Sam Haws, in their official capacity as Commissioners of the Idaho State Tax Commission, Defendants–Appellants.

Coeur D'Alene Tribe of Idaho; Nez Perce Tribe, Plaintiffs,

and

Shoshone–Bannock Tribes, Plaintiff–Appellant,

v.

Duwayne D. Hammond, Jr.; Coleen Grant; Larry Watson; Severina Sam Haws, in their official capacity as Commissioners of the Idaho State Tax Commission, Defendants–Appellees.

Coeur D'Alene Tribe of Idaho, Plaintiff–Appellant,

and

Shoshone–Bannock Tribes; Nez Perce Tribe, Plaintiffs,

v.

Duwayne D. Hammond, Jr.; Coleen Grant; Larry Watson; Severina Sam Haws, in their official capacity as Commissioners of the Idaho State Tax Commission, Defendants–Appellees.

Nos. 02–35965, 02–35998, 02–36020.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed Aug. 19, 2004.

Clay Smith (argued), Boise, ID, for defendants-appellants/appellees.

Brian J. Cleary (argued), Coeur D'Alene, ID, for the plaintiffs-appellees/appellants.

William Bacon, Fort Hall, ID, for the plaintiffs-appellees/appellants.

Richard K. Eichstaedt, Lapwai, ID, for the plaintiffs-appellees/appellants Nez Perce Tribe.

Douglas B.L. Endreson (argued), Washington, D.C., for the intervenor-appellant/appellee.

Before: KLEINFELD, GOULD, and TALLMAN, Circuit Judges.

GOULD, Circuit Judge:

We must decide whether Indian tribes have sovereign immunity from an Idaho state tax on motor fuel delivered by non-tribal distributors to tribally-owned gas stations for sale on Indian reservations. The Supreme Court of Idaho ruled in 2001 that the incidence of essentially the same tax fell impermissibly on the Indian tribes, and that Congress had not through the

Hayden–Cartwright Act authorized states to abrogate the Indian tribes' sovereign immunity from taxation on the fuel sold on their reservations. After this state court ruling became final, the Idaho legislature attempted to modify the impact of the state court ruling by amending the tax law to provide expressly that the incidence of the Idaho state tax falls on the non-tribal distributors, not on the tribes who owned the retail gas stations located on the tribes' reservations. The tribes sued the Idaho State Tax Commissioners ("Commissioners") in federal district court to enjoin them from collecting the motor fuels tax. Notwithstanding the legislative amendment, the district court reached the same conclusion that the Supreme Court of Idaho had reached, that the incidence of the tax fell on the tribes and that sovereign immunity had not been waived. The district court accordingly granted summary judgment to the tribes and enjoined the Commissioners from enforcing the Idaho Motor Fuel Tax on "motor fuel delivered to, received by, or sold by Tribal or Indian owned retail gasoline stations in the Coeur d'Alene, Nez Perce, or Shoshone Bannock Reservations."

The Commissioners appeal the district court's decision and present two issues: Does the legal incidence of the tax fall impermissibly on Indian retailers, or permissibly on non-tribal distributors? If the incidence falls on the Indians, does the Hayden–Cartwright Act, which authorizes states to tax motor fuel sales on "United States military or other reservations," apply to Indian reservations? On the second of these issues, we must address the tribes' argument on cross-appeal that because the Supreme Court of Idaho has previously ruled on the applicability of the Hayden–Cartwright Act in this context, the state is barred from re-litigating the matter. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

The federally recognized tribes pursuing this litigation—the Coeur d'Alene Tribe, the Nez Perce Tribe, and the Shoshone–Bannock Tribes (collectively, "Tribes")—own and operate retail gas stations on their Idaho reservations. For several years, the Idaho State Tax Commission ("Commission") imposed a tax of twenty-five cents per gallon on all motor fuel delivered to the Tribes' retail gasoline centers within the borders of the Tribes' reservations. The Tribes' fuel distributor, pursuant to Idaho statute, collected the motor fuels tax and remitted it to the Commission. Substantially all proceeds from the state motor fuel tax are used for highway construction and maintenance.

In 2001, the Supreme Court of Idaho declared unlawful the State's taxation of the Indian reservations. *See Goodman Oil Co. v. Idaho State Tax Comm'n*, 136 Idaho 53, 28 P.3d 996 (Idaho 2001), *cert. denied*, 534 U.S. 1129, 122 S.Ct. 1068, 151 L.Ed.2d 971 (2002). In *Goodman Oil*, the Supreme Court of Idaho held that the legal incidence of the state fuel tax falls on the retailers, and that federal law bars the imposition of the tax on tribal retailers in the absence of clear congressional authorization. The state supreme court ruled, in turn, that section 10 of the Hayden–Cartwright Act, codified as amended at 4 U.S.C. § 104, does not provide the required authorization of the State to collect the fuel tax from distributors who sell fuel to tribal retailers on Indian reservations. Section 10 of the Act, in part, states:

Tax on motor fuel sold on *military or other reservation* [;] reports to State taxing authority

(a) All taxes levied by any State, Territory, or the District of Columbia upon, with respect to, or measured by, sales,

purchases, storage, or use of gasoline or other motor vehicle fuels may be levied, in the same manner and to the same extent, with respect to such fuels when sold by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, *located on United States military or other reservations,* when such fuels are not for the exclusive use of the United States.

(b) The officer in charge of such reservation shall, on or before the fifteenth day of each month, submit a written statement to the proper taxing authorities of the State, Territory, or the District of Columbia within whose borders the reservation is located, showing the amount of such motor fuel with respect to which taxes are payable under subsection (a) for the preceding month.

4 U.S.C. § 104 (emphasis added).

Following the decision in *Goodman Oil,* each Tribe enacted its own fuel tax for improving and maintaining roads on its reservations. The Idaho state legislature responded to the Supreme Court of Idaho's decision in *Goodman Oil* by amending the motor fuel tax on March 23, 2002. The amended law declared that the legal incidence of the tax was not on the retailer, but was on the distributor. 2002 Idaho Sess. Laws ch. 174 (H.B.732) ("Chapter 174"). The legislature declared explicitly in the law's uncodified "Statement of Intent" that:

> The Legislature intends by this act to modify the holding of the Idaho Supreme Court in the case of *Goodman Oil* . . . . Specifically, the Legislature intends, by this act, to expressly impose the legal incidence of motor fuels taxes upon the motor fuel distributor who re-

ceives (as "receipt" is defined in Section 63–2403, Idaho Code) the fuel in [Idaho]
> . . . .

Chapter 174, § 1. In addition to stating that the legal incidence of the tax is intended to fall on the fuel distributor, the legislature amended the statute to indicate that the Commission was no longer imposing the tax "for the privilege of using the public highways upon the use or possession for use of gasoline," but rather, was imposing the tax "upon the receipt of motor fuel in this state by any distributor receiving motor fuel upon which the tax imposed by this section has not previously been paid." Idaho Code § 63–2402(1). *See also id.* § 63–2405 (the tax "imposed by section 63–2402 . . . is to be paid by the distributor, and measured by the total number of gallons of motor fuel received by him.").

After the amendments of Chapter 174, which the legislature made retroactive to July 1, 1996,[1] the Indians' fuel distributor was required to collect and remit to the state the tax on fuel sold to the Tribes. After the amended law became effective, the Tribes went to federal district court to enjoin the Commissioners from collecting the motor fuels tax. The Tribes argued, *inter alia,* that the legal incidence of the fuel tax continued to fall unlawfully on the Indian retailers despite the legislative amendment, and that the tax was unenforceable because the United States Congress had not clearly authorized abrogation of the Indian tribes' sovereign immunity.

The district court addressed whether the legal incidence of the tax, as modified by Chapter 174, fell on the distributor, and whether the Hayden–Cartwright Act au-

---

**1.** The permissibility of the state legislature's designation of the amendments as retroactive is not at issue on this appeal.

thorized application of the motor fuels tax to fuel sold to the Indians on their reservations. Answering "no" to both questions, the district court granted the Tribes' motions for summary judgment, and enjoined the state "from enforcing the Idaho Motor Fuel Tax, I.C. § 36–2401, *et seq.* . . . with respect to motor fuel delivered to, received by, or sold by Tribal or Indian owned retail gasoline stations on the Coeur d'Alene, Nez Perce, or Shoshone Bannock Reservations." *Coeur D'Alene Tribe v. Hammond,* 224 F.Supp.2d 1264, 1271 (D.Idaho 2002). The Commissioners appeal the summary judgment entered against them.[2]

We first analyze where the legal incidence of the tax falls, considering both the legislative amendments to the statute and its operative provisions. Concluding that the tax incidence still falls on the Tribes, we next address the Tribes' cross-appeal urging that the Commissioners are barred from relitigating the question whether the Hayden–Cartwright Act provides clear congressional authorization for the state tax. Concluding that there is no bar to relitigation by the Commissioners in this context, we resolve the question whether the Hayden–Cartwright Act, by authorizing state taxation of motor fuel delivered to "United States military or other reservations," permits the Commissioners to tax motor fuel delivered to and sold on the Tribes' Indian reservations.

## II

▮ Whether the legal incidence of the Idaho motor fuel tax is borne by the non-tribal distributors, or by the Indian retailers to whom the distributors sell the motor fuel, is a "frequently dispositive question in Indian tax cases," because "[i]f the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458–59, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995). Stated simply, if the state tax's incidence falls on the Indians, it is unlawful absent a "clear congressional authorization" to the contrary.[3] *Id.* at 459, 115 S.Ct. 2214.

▮ The question of where the legal incidence of a tax lies is decided by federal law. *See Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 121, 74 S.Ct. 403, 98 L.Ed. 546 (1954). As a general rule for deciphering legal incidence, the United States Supreme Court has instructed that we are to conduct "a fair interpretation of the taxing statute as written and applied." *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe,* 474 U.S. 9, 11, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985) (per curiam). The person or entity bearing the legal incidence of the tax is not necessarily the one bearing the economic burden. *See Chickasaw Nation,* 515 U.S. at 460, 115 S.Ct. 2214. Rather, to discern where the legal incidence lies, we "ascertain[ ] the legal obligations imposed upon the concerned parties," and this inquiry "does not extend to divining the legislature's 'true' economic object." *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1111 (9th Cir.1981). Further, a party does not bear the legal incidence of the tax if it is merely a transmittal agent for the state tax collector. *Chickasaw Nation,* 515 U.S. at 461–62, 115 S.Ct. 2214; *see also United States v. Cal.*

---

2. Our review of the summary judgment is de novo. *SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 855 (9th Cir.2001).

3. If the incidence of the tax falls on the nontribal distributors, we conduct a balancing test weighing federal, state, and tribal interests, in addition to considering any federal law to the contrary. *Chickasaw Nation,* 515 U.S. at 459, 115 S.Ct. 2214.

*State Bd. of Equalization,* 650 F.2d 1127, 1131 (9th Cir.1981) ("[T]he legal incidence of a tax does not necessarily fall on the party who acts as conduit by forwarding collected taxes to the state.").

## A

As we have noted, before the Idaho legislature amended the tax statute to assert its explicit intention to have the legal incidence fall on the non-tribal distributors, the Supreme Court of Idaho had squarely held that the incidence of the Idaho state fuel tax lay impermissibly on the Indians. *Goodman Oil,* 28 P.3d at 1004. The district court here held that despite the subsequent legislative amendment to the state tax, which recited that the state legislature intended the tax's incidence to fall on the non-tribal distributors, the incidence of the tax remained unchanged. The district court rejected the defendant Commissioners' argument that the "incantation by the legislature that the legal incidence falls on the distributor" is conclusive, *Hammond,* 224 F.Supp.2d at 1270. The district court was not persuaded that conclusive legal effect had to be given the state legislature's statements. Defendants had relied upon the legislature's statement of intention in the amendment, and had urged as controlling the Supreme Court's reference in *Chickasaw Nation* to "dispositive language" from a state legislature. The district court rejected this argument, reasoning: "Certainly, the [Supreme] Court could not expect the state to make no changes in the substance of the tax and thereby allow it to avoid the constitutional

prohibition of imposing taxes on Indians. Moreover, such a simplistic view would undo the nuanced application of law that the Court undertook in [*Chickasaw Nation* ]." *Id.* at 1270–71.

On the Commissioners' appeal of the district court's decision about legal incidence, we first address the Commissioners' reiterated argument that the legislature's amendment to the law is sufficient to settle the matter about where the incidence lies. The Commissioners continue to rely on *Chickasaw Nation* for the proposition, advanced tenaciously, that the legislature's designation is "dispositive" to decide legal incidence. 515 U.S. at 461, 115 S.Ct. 2214. In *Chickasaw Nation,* the Supreme Court held that an Oklahoma motor fuels tax was not applicable to fuel sold by Indian tribes on their reservations. In so holding, the Court noted that the statute in question did "not expressly identify who bears the tax's legal incidence," and that "[i]n the absence of such dispositive language, the question is one of fair interpretation of the taxing statute as written and applied." *Id.* at 461, 115 S.Ct. 2214. The Commissioners read this to mean that our sole function as a reviewing court deciding the question of a tax's legal incidence is to determine the legislature's intent. The Commissioners contend that if the state legislative intent is clear, we must without more defer to the state legislature's interpretation of its own statute, and the analysis of incidence ends there.[4] We disagree.

The incidence of a state tax on a sovereign Indian nation inescapably is a question of federal law that cannot be conclu-

---

4. The Commission also relies on *United States v. Cal. State Bd. of Equalization,* 650 F.2d 1127, 1130–1131 (9th Cir.1981), for the proposition that "[t]he legal incidence of a tax falls on the party who the legislature intends will pay the tax." This is not the end of the story, however, for the legislature's statement of its own intention is not solely determinative of

the legal incidence question. We went on to state in that case, "In determining who the legislature intends will pay the tax, the *entire state taxation scheme* and the context in which it operates *as well as the express words of the taxing statute must be considered.*" *Id.* at 1131 (emphasis added).

sively resolved in and of itself by the state legislature's mere statement. The Supreme Court in *Chickasaw Nation* was not facing the case of an explicit legislative designation. *See* 515 U.S. at 461, 115 S.Ct. 2214 ("The Oklahoma legislation does not expressly identify who bears the tax's legal incidence—distributors, retailers, or consumers[.]"). In that sense, one might view as dictum the sentence in *Chickasaw Nation* relating to explicit legislative designation of intent concerning incidence.[5]

■ Even if it could be considered a dictum, however, that would be of little significance because our precedent requires that we give great weight to dicta of the Supreme Court. *See United States v. Montero–Camargo*, 208 F.3d 1122, 1132 n. 17 (9th Cir.2000) ("Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding.") (internal quotation marks and citations omitted).

Nonetheless, whether we view the statement in *Chickasaw Nation* as holding by which we are bound, or as a dictum that we must consider seriously, the Supreme Court's use of the term "dispositive" in context appears to us to relate to the legislature's *intent* about where the incidence of the tax lies, and not to the ultimate federal question of where the tax's legal incidence lies. If the legislature could indirectly tax Indian nations merely by reciting *ipso facto* that the incidence of the tax was on another party, it would wholly undermine the Supreme Court's precedent that taxing Indians is impermissible absent clear *congressional* authorization. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (concluding that the Indians' exemption from state taxation is lifted "only when Congress has made its intention to do so unmistakably clear."). Such a holding would permit states to set policy in a way that risks undermining the preserved sovereignty of Indian nations. We do not believe that the Supreme Court's precedent can properly be so construed.

■ As we have already noted, the question of incidence has been explicitly held by the United States Supreme Court to be one of federal law. *Kern–Limerick, Inc.*, 347 U.S. at 121, 74 S.Ct. 403. *Chickasaw Nation*, though it did mention the notion of a "dispositive" legislative intent, did not overrule *Kern–Limerick*.[6]

---

5. The district court here characterized the statement from *Chickasaw Nation* relied upon by the Commissioners as "merely dicta," and went on to give its reasons why the state legislative declaration, without change of substance in the statute, could not be controlling. *Hammond*, 224 F.Supp.2d at 1270–71.

6. Even if it could be argued that the sentence relied upon by the Commissioners from *Chickasaw Nation* to a degree undermines *Kern–Limerick*, we are not at liberty to disregard the holding of *Kern–Limerick* that federal law controls a determination of tax incidence. The courts of appeals may not hold that a subsequent Supreme Court case has rendered unsound an earlier Supreme Court case, for it is the Supreme Court's own prerogative to assess its cases. *See, e.g., Hoffman v. Arave*, 236 F.3d 523, 542 (9th Cir.2001) ("[I]t is not our place to engage in anticipatory overruling. The Supreme Court has specifically directed lower courts to 'leav[e] to this Court the prerogative of overruling its own decisions.' ") (citing *Agostini v. Felton*, 521 U.S. 203, 207, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). However, the argument of inconsistency is not persuasive because the natural reading of *Chickasaw Nation's* text, for us, suggests that a legislative declaration is dispositive of the legislature's intent, not that it necessarily and conclusively answers the ultimate question of legal incidence of a state tax, at least where the tax would intrude on Indian sovereignty.

In *Kern–Limerick*, the Supreme Court squarely rejected the idea that "a state court might interpret its tax statute so as to throw tax liability where it chose, even though it arbitrarily eliminated an exempt sovereign," because "[s]uch a conclusion . . . would deny the long course of judicial construction which establishes as a principle that the duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest." *Id.* The district court elaborated persuasively on this point, stressing that there had been "no change in the substance of the tax[.]" *Hammond,* 224 F.Supp.2d at 1270–71. *See also Lawrence v. State Tax Comm'n of Mississippi,* 286 U.S. 276, 280, 52 S.Ct. 556, 76 L.Ed. 1102 (1932) ("The present tax has been defined by the Supreme Court of Mississippi as an excise and not a property tax, but in passing on its constitutionality we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it.") (internal citations omitted).

■ We agree with the Tribes that if we determined legal incidence solely by looking at the legislature's stated intent, we would be permitting the state to name one party the taxpayer while requiring another to pay the tax, in the process avoiding tax immunities held by the second party. Thus we conclude that, while the legislative declaration is "dispositive" as to what the legislature *intended,* removing the need to predict the legislative aim from reports and legislative statements, it cannot be viewed as entirely "dispositive" of the legal issue that the federal courts are charged with determining as to the incidence of the tax. And this is not merely a

technical tax issue: If state legislatures could tax Indian tribes merely on the assertion that the incidence of the tax lies elsewhere, it would permit states indirectly to threaten the very existence of the Tribes. It has long been understood in our nation that, in the adage coined by the great Chief Justice John Marshall, the unchecked power to tax is the power to destroy. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819).

■ Our conclusion is reinforced by the context here. The Supreme Court of Idaho had previously ruled in *Goodman Oil* that the incidence of the tax was on the Indians under the pre-existing statutory scheme. That state supreme court decision is entitled to weight on how we assess the legal incidence of the tax from its operation. *See American Oil Co. v. Neill,* 380 U.S. 451, 455–56, 85 S.Ct. 1130, 14 L.Ed.2d 1 (1965) ("When a state court has made its own definitive determination as to the operating incidence [of a tax], our task is simplified. We give this finding great weight in determining the natural effect of a statute, and if it is consistent with the statute's reasonable interpretation it will be deemed conclusive."). The Commissioners urge us to accord little weight to the Supreme Court of Idaho's determination, pointing out that the state supreme court's analysis was predicated on the statute *before* the law was amended by the legislature. That is true so far as it goes, but the more important point, as the district court reasoned, is that the operative tax provisions on which *Goodman Oil* was based, as previously analyzed by the state's highest court, remained in substance unchanged by the state legislative efforts to circumvent *Goodman Oil.*[7] Aside from adding a

---

7. The Commissioners' reliance on *Chickasaw Nation,* 515 U.S. at 460, 115 S.Ct. 2214 for the proposition that "if a State is unable to enforce a tax because the legal incidence of

the impost is on Indians or Indian tribes, the State generally is free to amend its law to shift the tax's legal incidence," is inapposite here. Such an amendment would accomplish

legislative purpose statement to the tax statute, the legislature made only minimal and cosmetic changes to the tax law, and did not alter the key substantive tax provisions that undergirded the state court's decision about legal incidence.[8]

 Under our view of the law as declared by the Supreme Court, we conclude that we should not, under the circumstances of this case, automatically defer to the Idaho state legislature's mere say-so about where the legal incidence of its motor fuels tax lies. We believe that automatic deference cannot follow where the incidence was previously determined to be on the Tribes by the Supreme Court of Idaho and the state legislature's subsequent amendments to the law, though adding a statement of legislative intent on incidence, did not materially alter the operation of the statute or its probable impact on the Tribes. A state legislature's declaration of intent cannot be viewed as alone controlling on the federal question whether the legal incidence of a state tax falls on a sovereign Indian nation.

the stated goal if the amendment shifted the *substance* of the legal burdens of the tax, instead of simply cosmetically re-assigning the incidence of the tax to suit the legislature's interests.

8. For example, Idaho Code § 63–2405 changed from denoting a tax "imposed on all gasoline received," to a tax "imposed upon the receipt of motor fuel in this state by any distributor." Despite the more specific language, about which the Commissioners make much ado, the *Goodman Oil* court had *already* interpreted the unamended statute as imposing a tax when the gasoline was received *by the fuel distributor, Goodman Oil*, 28 P.3d at 1002, so the legislative amendment offers no substantive shift in the analysis. Even more cosmetic are some of the remaining changes: In Idaho Code §§ 63–2401(1)–24, 63–2403, the words "gasoline" and "special fuels" were replaced by the more inclusive term,"motor fuel," and Idaho Code § 63–2405 and § 63–2406(3) were harmonized to indicate that the distributor no longer had to

## B

 We must evaluate the incidence of the Idaho Motor Fuels Tax in light of the state statutory scheme, an assessment of its effects, and the total circumstances germane to incidence. To determine where the legal incidence of the fuel tax fell in the old statutory scheme, the Supreme Court of Idaho used as its guide the United States Supreme Court's analysis of a "strikingly similar" statute in *Chickasaw Nation. Goodman Oil*, 28 P.3d at 1003. Critical to our analysis is our conclusion that the relevant operative provisions of the fuel tax that the state supreme court analyzed have not changed. We review them below and we also stress the similar provisions analyzed in the *Chickasaw Nation* case.

First, Idaho law still requires the nontribal distributor who receives the motor fuel and sells it to the Indian tribes to pass on and to collect the tax from the retailer, and then to remit the taxes to the State.[9]

be "licensed" in order to be obligated to pay the tax and report it on the monthly distributor's report.

9. Idaho Code § 63–2406(4) provides, in part, that "[a]ny distributor required to pay the tax imposed by this chapter who fails to pay such tax shall be liable to the commission for the amount of tax not remitted plus any applicable penalty or interest." Idaho Code § 63–2435 provides:

When a distributor sells gasoline or aircraft engine fuel subject to tax under this chapter or a special fuels dealer sells special fuels subject to tax under this chapter, a portion of the receipts from those sales equal to the amount of tax required to be paid upon the fuels sold shall, immediately upon receipt by the distributor or special fuels dealer, be state money and shall be held in trust for the state of Idaho and for payment to the commission in the manner and at the times required by this chapter. This tax money shall not, for any purpose, be considered to

Section 2435 declares that state fuel taxes are included in every taxable sale of gasoline made by a distributor and that upon receipt of payment by the distributor, an amount equal to the tax is money due the state, which the distributor holds in trust for payment to the state. Driving this point home, all invoices for sales by distributors to retailers must show that the state fuel tax was charged to the retailer. Idaho Admin. Code § 35.01.05.150.g.[10] Similarly, in *Chickasaw Nation* the Supreme Court noted that "Oklahoma's law requires fuel distributors to 'remit' the amount of tax due to the Tax Commission," 515 U.S. at 461, 115 S.Ct. 2214, and held that where "[t]he import of the language and the structure of the fuel tax statutes is that the distributor collects the tax from the retail purchaser of the fuel, the motor fuel taxes are legally imposed on the retailer rather than on the distributor or the consumer." *Id* at 462. (internal quotation marks omitted).[11]

Second, as in *Chickasaw Nation,* the state statute in this case provides tax credits to the distributor for "collecting and remitting" the tax on behalf of the State. Idaho Code § 63–2407(4).[12] *See Chickasaw Nation,* 515 U.S. at 462, 115 S.Ct. 2214 ("[F]or their services as agent of the state for [tax] collection, distributors retain a small portion of the taxes they collect.") (internal quotation marks and citations omitted). The Commissioners argue that getting a credit for the administrative costs attendant to collection and remittance of the motor fuels tax does not transform the statute into a "collect and remit scheme." The Commissioners argue that the provision accommodates the commercial reality that the tax will be passed through the distribution chain and embodies a legislative conclusion that public poli-

be a part of the proceeds of the sale to which the tax relates....

10. Idaho Admin. Code § 35.01.05.150.01.g. provides:

Price per gallon and total amount charged. When taxable motor fuels products are sold, at least one (1) of the following must be used to establish that the Idaho state fuel tax has been charged:
i. The amount of Idaho state fuels tax;
ii. The rate of Idaho state fuels tax; or
iii. A statement that the Idaho state fuels tax is included in the price.

The Commissioners urge us to disregard this administrative rule, on the theory that its function is to safeguard customers who seek a refund and wish to prove that they have paid a tax. Although this might be an added benefit of the rule, we are persuaded that the rule lends support to the idea that distributors are required to pass on the tax to retailers.

11. This unambiguous language from *Chickasaw Nation* defeats the Commissioners' argument that the provision describing the tax and remit scheme "says nothing relevant to who bears the tax's legal incidence." Further, although the Commissioners argue that the provision's purpose is only to protect the state's

interest against judicial proceedings directed at the distributor's assets, the source of the funds the distributor collects—which are placed in trust for the state-is the tax that is assessed on and collected from the *retailers.* That is, the distributor never receives title to the state's share of the retailer's funds.

12. Idaho Code § 63–2407(4) states, in relevant part:

The number of gallons which would be equal to one percent (1%) of the total number of gallons received during the reporting period, less the total number of gallons deducted under subsections (1) through (3) of this section, *which credit is granted to the licensed distributor to reimburse him for the expense incurred on behalf of the state of Idaho in collecting and remitting motor fuel tax moneys,* maintaining necessary records for the state, preparing necessary reports and remittances in compliance with this chapter, and for loss from evaporation, handling, spillage and shrinkage, except losses caused by casualty as provided in subsection
(3) of this section.
(emphasis added).

cy is furthered by allowing distributors to recover a portion of their administrative costs. We are not persuaded that the provision, by reflecting an economic reality, ceases to carry weight in our determination that the essence of the distributor's role is to collect from the tribal retailers on behalf of the state, and to remit the motor fuel tax moneys to the state. The Commissioners cite to no cases holding to the contrary. Further, the Supreme Court in *Chickasaw Nation* did not purport to ignore the economic reality of the deduction when it considered the deduction a factor supporting that the tax incidence lay impermissibly on the tribal retailers.

Third, Idaho gives tax credits to the distributor for fuel taxes that the distributor has paid but cannot then collect from the retailer.[13] For example, if the distributor receives one hundred gallons of motor fuel and sells only seventy gallons, the distributor receives a tax credit for the thirty unsold gallons. This squares with *Chickasaw Nation:* "[I]f the distributor remits the taxes it subsequently is unable to collect from the retailer, the distributor may deduct the uncollected amount from its future payments to the Tax Commission. The distributor, then, is no more than a transmittal agent for the taxes imposed on the retailer." *Chickasaw Nation,* 515 U.S. at 461–62, 115 S.Ct. 2214 (internal quotation marks and citations omitted). The Commissioners urge us not

to rely on this statutory provision. The Commissioners argue that the statutory provision giving the credit merely recognizes the economic reality that fuel taxes are passed through the commercial chain, and the credit mitigates the injury suffered by a distributor when it has paid taxes on fuel that it sells but for which it is not paid. But we consider that this argument is of no moment, considering that the United States Supreme Court held in *Chickasaw Nation,* despite administrative justifications for the credit, that "[t]he inference that the tax obligation is legally the retailer's, not the distributor's" is supported by the deduction provisions for uncollected payments. *Id* at 461, 115 S.Ct. 2214. *See also Goodman Oil,* 28 P.3d at 1003. This provision, taken together with the ones previously discussed, further underscores the "tax and remit" feature of the statute, which places the legal incidence on the retailers, not the distributors.

Fourth, Idaho law provides that the retailer has the right to any refund of fuel taxes sought by the distributor that the retailer has paid.[14] However, the retailers are neither allowed to set off their liability when *consumers* fail to make payments, nor are they compensated for their tax collection efforts. Further, the Idaho statute imposes the tax whether or not the fuel is ever sold to the Indian retailers' customers. So it is plain that the tax buck stops with the Indian tribal retailers. The Supreme Court in *Chickasaw Nation* not-

13. Idaho Code § 63–2407(6) provides:

> For sales made on or after July 1, 1995, taxes previously paid on gallons represented by accounts found to be worthless and actually charged-off for income tax purposes may be credited upon a subsequent payment of the tax provided in this chapter or, if no such tax is due, refunded. If such accounts are thereafter collected, the tax per gallon shall be paid based upon the amount actually received divided by the

> price per gallon of the original sale multiplied by the appropriate tax rate.

14. Idaho Admin. Code § 35.01.05.180.02 states, in relevant part, that a distributor's claim for a refund "must include a statement that the amount refunded to the licensed fuel distributor has been, or will be, refunded by the fuel distributor to the purchaser [retailer], or that such motor fuel tax or transfer fee have never been collected from the purchaser [retailer]."

ed similar points instructive to its conclusion that the incidence of the tax fell on the retailer: "No provision sets off the retailer's liability when consumers fail to make payments due; neither are retailers compensated for their tax collection efforts. And the tax imposed when a distributor sells fuel to a retailer applies whether or not the fuel is ever purchased by a consumer." 515 U.S. at 462, 115 S.Ct. 2214.

Because the Idaho tax statute's provisions mirror several of those present in, or conspicuously absent from, the statute at issue in *Chickasaw Nation*, and in light of the probable operational effects of the Idaho Motor Fuels Tax in its context, we hold that the legal incidence of this tax falls on the tribal retailers. We agree with the district court that "the statute retains the 'pass through' quality of the prior statute," and that it is still a " 'collect and remit' scheme which places the incidence of the tax on the Indian retailers." *Hammond*, 224 F.Supp.2d at 1270. Under federal law, it is unlawful to place the legal incidence of the tax on tribal retailers absent "clear congressional authorization" for the Idaho state taxation of the Tribes. *Chickasaw Nation*, 515 U.S. at 459, 115 S.Ct. 2214.[15]

### III

▮▮▮ Having determined that the legal incidence of the tax falls on the Indians,

we must address whether clear congressional authorization exists for imposing the tax. Here, we meet a preliminary issue at the threshold. The Tribes argue in their cross-appeal that, in light of the Supreme Court of Idaho's ruling on the question in *Goodman Oil*, the Commissioners are collaterally estopped from re-litigating whether the Hayden–Cartwright Act abrogates tribal immunity from state taxation of motor fuel sales on Indian reservations.

▮▮▮ We "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (interpreting 28 U.S.C. § 1738). We ask whether the state of Idaho would give preclusive effect to the ruling against the Commission in *Goodman Oil.* The parties are not identical, but on the Idaho side they are closely related and in privity. In *Goodman Oil*, the defendant was the Idaho Tax Commission, and here the Defendants–Appellants are the Commissioners of that same commission. The Supreme Court of Idaho applies a five-factor test for assessing whether collateral estoppel bars re-litigation of an issue determined in a prior proceeding,[16] but it has abandoned

---

15. Might one argue to the contrary that the incidence of the tax falls on the distributor if the distributor "receives" fuel, stores rather than sells it, and then is required by law to remit taxes to the state? We think not. The distributors who receive fuel in almost all cases plan and act to sell it. Even if a distributor were to hold inventory for a time, say to speculate on a pending price increase, in the ordinary course the gas later will be sold and the tax passed on to the retailer. Moreover, even if the point has partial validity in a case where a distributor buys to hoard rather than to sell, it does not undercut our conclusion that the statute's overall scheme places the legal incidence of the tax on the retailers.

16. As set forth in *Rodriguez v. Dep't of Correction*, 136 Idaho 90, 29 P.3d 401, 404 (2001), the factors are:

(1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

the mutuality requirement as a prerequisite to the application of collateral estoppel. *See W. Indus. & Envtl. Servs., Inc. v. Kaldveer Assocs., Inc.,* 126 Idaho 541, 887 P.2d 1048, 1052 (Idaho 1994) ("We have ... confirmed that the lack of mutuality of parties is not a bar to the application of collateral estoppel."). However, the Supreme Court of Idaho has never applied nonmutual offensive collateral estoppel against a *state* party on a question of *law.* Here, the defendant Commissioners, sued in their official capacity, are in substance a state party.

■ " 'Offensive' collateral estoppel refers to the situation where the plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *Nat'l Med. Enters., Inc. v. Sullivan,* 916 F.2d 542, 545 n. 2 (9th Cir.1990). Given the dearth of Idaho state precedent on the applicability of nonmutual offensive collateral estoppel against a state party, we look to general state law to divine the preclusive force of such judgments in this context, *see Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 375, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), and we look to the law as generally applied in other jurisdictions, *see Haring v. Prosise,* 462 U.S. 306, 314, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983).

■ Absent clearly applicable state law governing the preclusive effect against the Commissioners, we are guided by the general law recited in the *Restatement (Second) of Judgments* § 29 (1982).[17] This

section provides that the circumstances we consider include whether:

> (7) The issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based[.]

Further, considering whether to grant preclusive effect to a legal question is constrained in a case, like this one, where the party against whom collateral estoppel would be imposed is a government agency:

> [I]t is also pertinent that the party against whom the rule of preclusion is to be applied is a government agency responsible for continuing administration of a body of law applicable to many similarly situated persons. When any of these factors is present, the rule of preclusion should ordinarily be superseded by the less limiting principle of stare decisis.

*Restatement (Second) of Judgements* § 29 cmt. i, illus. 8 (1982).

■ Here, the Tribes seek to foreclose the state Commissioners on a *legal* question regarding the applicability of a federal law. We hesitate to give preclusive effect to the previous litigation of a question of law by estoppel against a state party when no state law precedent compels that we do so. By analogy, in *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Supreme Court rejected a claim of collateral estoppel against the government. There, a Filipino national asserted a claim for naturalization based on a due process challenge to the United States's administration of the Na-

---

17. The Supreme Court of Idaho has declined to adopt the *Restatement* "categorically," but it "has consistently displayed its preference for selectively examining various sections and comments [of the *Restatement* ] and thereafter adopting, citing favorably, or rejecting the provision, as the occasion warrants." *Dia-* *mond v. Farmers Group, Inc.,* 119 Idaho 146, 804 P.2d 319, 322 (1990). Here, where we have found little state precedent on point, it is appropriate for us to assess the general state law, and on this the *Restatement* provision we cite is persuasive.

tionality Act. Neither the district court nor the court of appeals reached the merits of the litigant's claims, because the courts held that the government "was collaterally estopped from litigating that constitutional issue in view of an earlier decision against the Government in a case brought by other Filipino nationals" in a United States district court.[18] *Id.* at 155, 104 S.Ct. 568. The Supreme Court unanimously reversed, holding that the government was situated differently from private parties for issue preclusion purposes:

> We have long recognized that the Government is not in a position identical to that of a private litigant, both because of the geographic breadth of government litigation and also, most importantly, because of the nature of the issues the government litigates ... [T]he government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity.... Government litigation frequently involves legal questions of substantial public importance.... Because of those facts the government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues.

*Id.* at 159–60, 104 S.Ct. 568 (internal quotation marks and citations omitted). The Supreme Court expressed concern that by estoppel against the government the development of the law would be stunted: "A rule allowing nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 160, 104 S.Ct. 568. *Accord Sullivan,* 916 F.2d at 545 (noting "the well-established rule that nonmutual offensive collateral estoppel

cannot be asserted against the government.").

The same considerations that counsel against applying nonmutual offensive collateral estoppel against the United States government on questions of law apply to precluding the Idaho Tax Commission from re-litigating the issue whether the Hayden–Cartwright Act applies to Indian reservations. This state agency might be called on to litigate often and in multiple fora against diverse litigants about questions of law with broad import. Rather than risk that an important legal issue is inadequately considered because of the "freezing effect" against which the *Mendoza* court warned, we consider anew the question whether the Hayden–Cartwright Act has authorized the state of Idaho to tax tribal retailers on the motor fuel delivered to the Tribes' reservations.

### IV

The Commissioners contend that if we determine that the legal incidence of the tax fall on the Indians, as we have now held, the Tribes cannot challenge the tax because Congress, by enacting the Hayden–Cartwright Act, has authorized states to impose the motor fuel tax on Indians. However, we cannot hold that Congress has authorized state taxation of Indians or Indian reservations unless we determine that Congress has "made its intention to do so unmistakably clear." *Blackfeet,* 471 U.S. at 765, 105 S.Ct. 2399; *see also Chickasaw Nation,* 515 U.S. at 459, 115 S.Ct. 2214 ("If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization."); *Prairie Band Potawatomi Nation v. Richards,* 241 F.Supp.2d 1295, 1304.

---

**18.** The government had not appealed the adverse ruling.

(D.Kan.2003)("Unless Congress makes it abundantly clear that it intends to grant taxing authority to the states, [we] must construe the statute as not allowing the taxation of Indians.").[19] Stated another way, we cannot find an implied waiver of sovereign immunity if the language, structure, and legislative history of the statute are ambiguous as to the scope of Congress's intent.

## A

**The question whether the Hayden–Cartwright Act** reaches Indian reservations is one of first impression for our Circuit. The Eighth Circuit, every federal district court, and every state court to address the issue thus far has held that clear congressional authorization under the Hayden–Cartwright Act is not present, rejecting states' attempts to tax Indians for motor fuel delivered and sold on their own reservations.[20] *See Marty Indian School Bd. v. South Dakota,* 824 F.2d 684, 688 (8th Cir.1987) ("[W]e agree with the district court's determination that section 104 [of the Hayden–Cartwright Act] does not support the imposition of the state's motor fuel tax on the Marty Indian School."); *Winnebago Tribe of Nebraska v. Kline,* 297 F.Supp.2d 1291, 1304 (D.Kan.2004)

(noting the ambiguity of the Act's language, and holding that the Hayden–Cartwright Act does not bar plaintiff's request for relief from state collection of fuel taxes); *Richards,* 241 F.Supp.2d at 1307 ("Interpreting ambiguities in the Act in favor of the Tribe, the Court finds that the language of the Act does not show that Congress consented to taxation of the Indian reservations.... Congress must be explicit if it intends to grant states the power to tax within Indian country, and ... the Court finds Hayden–Cartwright does not provide for an explicit grant of Congressional authority for state taxation of motor fuel delivered to Indian reservations[.]"); *Pourier v. South Dakota Dep't of Revenue,* 658 N.W.2d 395, 399 (S.D. 2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2400, 158 L.Ed.2d 965 (2004) ("The language of the statute does not make Congress' intention to allow such taxation 'unmistakably clear.' "), *vacated, in part, on other grounds by* 674 N.W.2d 314; *Goodman Oil,* 28 P.3d at 1001–02 (holding that the Hayden–Cartwright Act does not apply to Indian reservations, and that the state's tax was therefore unconstitutional as applied to Indians), *cert. denied,* 534 U.S. 1129, 122 S.Ct. 1068, 151 L.Ed.2d 971 (2002).[21]

**19.** The "unmistakably clear" standard in this context mirrors that which the States enjoy in the Eleventh Amendment context. *See, e.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself."); *Oregon v. Ashcroft,* 368 F.3d 1118, 1125 (9th Cir.2004).

**20.** On two occasions, the Supreme Court has declined to address explicitly whether this is the correct interpretation of the Hayden–Cartwright Act. *See Chickasaw Nation,* 515 U.S. at 456–57, 115 S.Ct. 2214 ("We decline to address this question of statutory interpretation" about whether "United States military or oth-

er reservations" includes "Indian reservations," because the government argued the point for the first time in its brief to the Supreme Court); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151 n. 16, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) ("We need not reach the more general question whether the Hayden–Cartwright Act applies to Indian reservations at all."). Absent definitive guidance from the Supreme Court, we must decide this issue.

**21.** *But see In re State Motor Fuel Tax Liab. of A.G.E. Corp.,* 273 N.W.2d 737, 739 (S.D.1978) (holding that an Indian reservation was a federal area subject to the Hayden–Cartwright Act, but analyzing the tax as levied on a *non-*

■ We agree with these courts' conclusions. Because the Eighth Circuit is the only circuit to have decided this issue, and because its discussion did not address the arguments presented by the Commissioners to us, we will review and analyze the issue in more detail.

**B**

■ We are mindful of the federal government's trust relationship with the Indian Nations, which generally is inconsistent with permitting state taxation of those sovereign Indian Nations where Congress has not so directed: "The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes ..., and in recognition of the sovereignty retained by Indian tribes even after formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their own territory." *Blackfeet*, 471 U.S. at 764, 105 S.Ct. 2399 (internal citations omitted).[22] As the Supreme Court held in *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, "[a]bsent cession of jurisdiction or other federal statutes permitting it ... a State is without power to tax reservation lands and reservation Indians." 502 U.S. 251, 258, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (internal quotation marks omitted). The United States Supreme Court has held that Congress cannot be said to have abrogated tribes' sovereignty, giving exception to the rule that "Indian tribes and individuals generally are exempt from state taxation within their own territory," unless Congress has "made its intention to do so

unmistakably clear." *Blackfeet*, 471 U.S. at 764–65, 105 S.Ct. 2399.

The Commissioners argue that this canon of statutory construction from the Indian context does not apply to this case, because the Hayden–Cartwright Act is a law of general, not specific, applicability. To aid its argument, the Commissioners cite *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), which stated that "a general statute in terms applying to all persons [such as the Federal Power Act] includes Indians and their property interests." But this argument misses the preliminary point of statutory interpretation; we must decide whether Section 10 of the Hayden–Cartwright Act gives a general command permitting state taxation of motor fuel sold to filling stations on Indian reservations.

**C**

■ We begin our analysis of the Hayden–Cartwright Act by examining the plain meaning of the statute's language.[23] *Wilderness Soc'y v. United States Fish & Wildlife Servs.*, 353 F.3d 1051, 1060 (9th Cir.2003), amended by 360 F.3d 1374 (9th Cir.2004). We also analyze the structure of the statute to inform our contextual analysis of its key words. *Castillo v. United States*, 530 U.S. 120, 124, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000). Finally, because we conclude that the language of the Hayden–Cartwright Act is ambiguous, we determine its scope with reference to its legislative history. *Rosebud Sioux Tribe*

---

*Indian* contractor doing work for the Bureau of Indian Affairs on tribal land.).

**22.** Our nation's aversion to state taxation of Indians is deep-rooted. As Judge William C. Canby explains in his helpful and scholarly book on Indian law, Congress required that several western states include in their consti-

tutions, as a condition of their admission into the Union, a prohibition against taxing Indian trust lands. William C. Canby, Jr., *American Indian Law in a Nutshell* 264 (4th ed.2004).

**23.** The text is set out in Section I, *infra*.

*v. Kneip,* 430 U.S. 584, 587, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

The Commissioners argue that the words of the Hayden–Cartwright Act, which allow states to impose a motor fuels tax when the fuel is sold on "United States military or other reservations, when such fuels are not for the exclusive use of the United States," 4 U.S.C. § 104, include Indian reservations. The Tribes, on the other hand, contend that the Hayden–Cartwright Act's language is not specific enough to extend to Indians. We agree with the Tribes.

Although the term "reservation" is commonly used when referring to Indian reservations, the word has a broader reach and is ambiguous in this context. As the district court noted, reservations include "military bases, national parks and monuments, wildlife refuges, and federal property." *Hammond,* 224 F.Supp.2d at 1269. The Supreme Court similarly observed in *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909), that "[t]he word [reservation] is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose." [24] The intent of Congress in authorizing taxes on fuel delivered to United States "reservations, in a statutory section that does not refer at all to Indians, Indian tribes, or Indian reservations," cannot be said to mean that states have been unmistakably authorized to impose taxes on deliveries to tribal gas stations within Indian reservations. There is no unmistakably clear congressional authorization for such a tax. *See Chickasaw Nation,* 515 U.S. at 459,

115 S.Ct. 2214; *Blackfeet,* 471 U.S. at 765, 105 S.Ct. 2399.

The Commissioners argue to the contrary, relying upon the Hayden–Cartwright Act's specification that the tax authority may levy the tax only when sold "by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, *licensed traders,* and other similar agencies." 4 U.S.C. § 104(a) (emphasis added). The Commissioners contend that the term "licensed trader" has been used to refer to traders subject to licensure under the Indian trader statutes. *See, e.g., Warren Trading Post Co. v. Arizona State Tax Comm'n,* 380 U.S. 685, 688, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). The Commissioners urge that "[i]t makes no sense to conclude that Congress used the terms 'reservations' and 'licensed trader' in the same statutory provision without recognition of their reach into Indian country."

We are not persuaded. Congress, in using the term "licensed trader," could have meant that the state tax may be assessed on non-Indian traders licensed to conduct business on *any* federal reservation subject to the Hayden–Cartwright Act. Even if to a degree, "licensed traders" may be associated with Indian reservations, the Act does not necessarily suggest that the tax could be imposed on Indian tribes, as opposed to on non-Indian traders licensed to do business on Indian reservations. For example, in *In re State Motor Fuel Tax Liab. of A.G.E. Corp.,* 273 N.W.2d 737 (S.D.1978), the Supreme Court of South Dakota held that the Hayden–Cartwright Act granted states "limited jurisdiction" to tax a non-Indian corporation

**24.** The Commissioners make much of the *Celestine* court's observation that the term "reservation" may include "Indian reservation," but we do not find this a determinative statement in light of the Supreme Court's ac-knowledgment, in the same case, that "a reservation is not necessarily 'Indian Country.' " *Celestine,* 215 U.S. at 285, 30 S.Ct. 93.

engaged in highway construction on an Indian reservation. The phrase "licensed trader" does not make unmistakably clear a congressional intent to authorize states to tax deliveries to tribal entities on Indian reservations.

Our assessment of the structure of the Hayden–Cartwright Act also leads us to reject the Commissioners' arguments. "[I]t is also a fundamental canon [of statutory construction] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Wilderness Soc'y*, 353 F.3d at 1060 (internal quotation marks omitted). The Hayden–Cartwright Act was first enacted in 1936 to amend the Federal Highway Act (Act of June 16, 1936, ch. 582, § 10, 49 Stat. 1519, Pub.L. No. 74–686).[25] The word "reservation" appears four times in the Hayden–Cartwright Act: (1) section three designates monies for the construction and maintenance of "main roads through unappropriated or unreserved public lands, non-taxable Indian lands, or other Federal reservations other than the forest reservations." *Id.* § 3; (2) section five applies to funds used to construct and maintain roads through "public lands, national forests, or other Federal reservations" to access national parks and monuments. *Id.* § 5; (3) section six allocates funds for construction and improvement of "Indian reservation roads." *Id.* § 6; and (4) section ten, at issue in this case, refers to "United States military or other reservations." *Id.* § 10. Had Congress intended in § 10 that "United States military or

other reservations" include Indian reservations, it could have made it clear. But Congress did not do so.[26]

Because the statute's terms are ambiguous in their context, it is not inappropriate to also consider legislative history. Congress passed the Hayden–Cartwright Act in 1936 as a floor amendment to the Federal Highway Act of 1936, which was designed to fund the extension of highway construction and maintenance. *Pourier*, 658 N.W.2d at 402. The Act was in part a response to a Supreme Court decision, *Standard Oil Co. v. California*, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775 (1934), which had invalidated a state license tax on a company distributing gasoline to a post exchange within the Presidio of San Francisco, a military reservation. The purpose of the Act was to stop motorists from avoiding state taxes by buying gas at such locations; it resulted from a "complaint in many parts of the country about the inability of the States to collect revenue on gasoline sold on Government reservations not for governmental use." 80 Cong. Rec. 6913 (May 8, 1936) (statement by Sen. Hayden). As the *Potawatomi* court observed, "The legislative history discussing the purpose of the Act never specifically refers to Indian reservations." 241 F.Supp.2d at 1306. Nowhere in the legislative history is it made clear that Congress intended the Act to apply to Indians or that Congress made manifest its unmistakably clear intent to abrogate Indian sovereign immunity. *See Pourier*, 658

---

25. *See infra* for further discussion of the legislative history of the Act.

26. As one commentator familiar with the *Goodman Oil* litigation has said:

> The intentional use of the modifier "Indian" in two of the four references to the word "reservation" shows that Congress was aware of the potential applicability of

the Act to Indian reservations. If Congress wanted to override the tribal exemption, it had the awareness and ability to do so by specifically designating Indian reservations within the language of section 10.

Karen Spinola, *The Road Less Traveled—Implications of the Goodman Oil Decision*, 38 Idaho L.Rev. 637, 648 (2002).

N.W.2d at 402–403.[27]

The Commissioners argue that the Act was passed to allow states to earn needed revenues to build and maintain roads throughout the state, including on Indian reservations. However, we share the *Goodman Oil* court's skepticism of assigning this legislative purpose to Indian reservation roads, in light of the fact that "Congress had already passed legislation authorizing appropriation of funds for survey, improvement, construction, and maintenance of Indian reservation roads." 28 P.3d at 1000.[28]

**D**

Were we to hold that Congress intended Indians to be subject to the Hayden–Cartwright Act, we would be required to make two leaps: first, that Congress meant "United States military or other reservations" to apply to Indian reservations without stating so specifically, and second, that Congress meant without saying so to abrogate the *Tribes'* sovereign immunity from taxation. *Bryan v. Itasca County*, 426 U.S. 373, 381, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) ("[S]ome mention [of the abrogation of tribal immunity] would normally be expected if such a sweeping change in the statute of tribal government and reservation Indians had been contemplated by Congress."). In passing the Hayden–Cartwright Act, Congress effectively waived the *federal* government's sovereign immunity from state tax collection. We cannot conclude that Congress's explicit concession permitting states to tax federal government reservations on motor fuel deliveries *also* embodied an implied vitiation of Indians' sovereignty. Given the standard for finding that Congress has authorized states by taxation to intrude on the sovereignty of Indian tribes, which requires that the showing of congressional intent be "unmistakably clear," and analyzing the Hayden–Cartwright Act's text, structure, and legislative history in this light, we conclude that Congress did not abrogate the Tribes' immunity from state taxation of fuels delivered to and sold on their reservations.

**27.** Section 10 of the Act was not even part of the original legislation, and it passed without any debate as to its language. 38 Idaho L.Rev. at 650–51.

**28.** The Commissioners urge that we defer to two early executive branch interpretations of the Hayden–Cartwright Act that the Commissioners argue construed "United States military or other reservations" to include Indian reservations. *See Application of Federal and State Sales Taxes to Activities of Menominee Indian Mills,* 57 I.D. 129, 138–39 (1940) (concluding that "United States military or other reservations" were meant to include Indian reservations, but still maintaining that "[i]t is not clear ... whether the Government agencies specified [in the Act] are intended to include such a Federal agency as the Menominee tribal enterprise *and whether the reference to reservations includes Indian reservations.*") (emphasis added); *Taxation by States of Motor–Vehicle Fuel Sold in National Parks,* 38 Op. Att'y Gen. 522, 524 (1936) ("It is true that some of the agencies which are expressly designated in Section 10 *apparently* are such as usually pertain to military, naval, or Indian reservations[.]") (emphasis added).

Relying on *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Commissioners argue that because Congress did not amend the statute in light of these two opinions, we can assume that Congress agreed with the interpretations about the abrogation of Indian tax immunity. However, the agency interpretations underscore the ambiguity, not the clarity, of the executive branch's statements insofar as they speak to the applicability of the Act to Indian reservations. Also, the United States today no longer holds the position that the Commissioners contend the United States held in the 1930s and '40s. *See* Brief for the United States as Amicus Curiae Supporting Respondent at 20–24, *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (No. 94–771).

## V

We determine as a matter of federal law that notwithstanding the Idaho legislature's attempt to assign the legal incidence of the motor fuels tax to the distributors, the tax's legal incidence falls on tribal retailers, not on the non-tribal distributors who act as transmittal agents for the state. Moreover, this tax is impermissible because Congress did not, in enacting the Hayden–Cartwright Act in 1936, provide the "unmistakably clear" authorization necessary to abrogate Indian tax immunities on the Tribes' reservations. *Blackfeet,* 471 U.S. at 765, 105 S.Ct. 2399.

**AFFIRMED.**

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

In my view, the Hayden–Cartwright Act expressly authorizes the tax at issue because it permits the state to impose the tax regardless of its incidence. The Act renders unnecessary the majority's highly indeterminate analysis of where the incidence of the tax falls.

That Act generally enables states to tax sales of fuel by or through "filling stations [and] licensed traders ... located on United States military or other reservations."[1]

If "military or other reservations" includes Indian reservations, the Act authorizes the tax. The Supreme Court identified the precise issue of whether "reservations" includes Indian reservations, and expressly avoided resolving it.[2] I would now answer that question in the affirmative.

There are two reasons that Indian reservations are "reservations" for purposes of the statute. First, it says so. It explicitly covers "reservations" and does not limit its coverage to military reservations. Black's Law Dictionary defines "reservation" as "[a] tract of public land set aside for a special purpose; esp., a tract of land set aside for use by an American Indian tribe."[3] The Supreme Court says that "[t]he word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose," such as "a military reservation, or an Indian reservation."[4] Except for lawyers, few people even know that what they call military "bases" are called military "reservations" in federal land law parlance. The word "reservation" ordinarily means and is most often used to mean Indian reservations. If the statute meant to make an exception to its "reservations" coverage for Indian reservations, it would have said "except for

1. "All taxes levied by any State, Territory, or the District of Columbia upon, with respect to, or measured by, sales, purchases, storage, or use of gasoline or other motor vehicle fuels may be levied, in the same manner and to the same extent, with respect to such fuels when sold by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, located on United States military or other reservations, when such fuels are not for the exclusive use of the United States. Such taxes, so levied, shall be paid to the proper taxing authorities of the State, Territory, or the District of Columbia, within whose borders the reservation affected may be located." 4 U.S.C. § 104(a).

2. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151 n. 16, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). *White Mountain* also points out that the special position of tribes, under current jurisprudence, is "not as nations." *Id.* at 142, 100 S.Ct. 2578. The majority opinion nevertheless denotes the tribes as "Nations," perhaps intending to accord the tribes a sovereign status less defeasible by Congress than current jurisprudence allows.

3. Black's Law Dictionary 1309 (7th ed.1999).

4. *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909).

Indian reservations." The Justice Department since 1936, and the Interior Department since 1940, have understood the Hayden–Cartwright Act to apply to Indian reservations.[5] This settled administrative interpretation ought to be given some deference.

Second, if anyone were to have any question whether Congress was speaking about, and considered, Indian reservations, the question would be answered by its express coverage of "licensed traders." Ordinarily one can operate a grocery store or a hardware store, or engage in other trades, without a license. The term "licensed trader" in federal statutes means one and only one thing: a person with a federal license to trade on an Indian reservation. Thus, it is "unmistakably clear"[6] that the Hayden–Cartwright Act expressly allows states to levy taxes on fuel sold on Indian reservations.

That is not to say that sales of gasoline to Indian tribes can be taxed under the statute. That may be a different question, one not raised by the parties in this case. Sales on reservations are not necessarily the same thing as sales to Indians or Indian tribes. Sales on reservations, but not to Indians, may be sales to non-Indians who drive to the reservation to get a bargain on untaxed gasoline. Whether Congress ought to provide for revenue and jobs to Indians on reservations by enabling them to sell untaxed gasoline, or whether it should provide for protection of state revenue from gasoline taxes by preventing Indian tribes from operating untaxed islands within states, are policy questions that may be answered either way. Congress has answered them and can change its answer. We have no say. The only question for us is whether the policy question was resolved by the Hayden–Cartwright Act. The words of the Act clearly do resolve it, in favor of the states.

A little reflection on why Indian reservations are called "reservations" would help to avoid confusion. From the 1780s, when the Articles of Confederation government enacted the Northwest Ordinance and its predecessors,[7] to 1986, when the Homestead Act repeal became effective in Alaska,[8] national policy on federally owned lands was to sell them cheap or give them away, rather than to hold on to them or charter them to great companies as England and Spain had. Once the southern states seceded, thereby losing control over the Senate (the South had traditionally opposed free land for ordinary farmers in the territories, because the small parcels would be incompatible with the economics of slavery), Republicans were able to enact the Homestead Act of 1862, turning squatters into landowners.[9] Though free land doubtless contributed to democracy, it was democracy that caused the government to adopt a policy of free land.

About all one had to do to get title to 160 acres of land under the Homestead

---

5. *See Taxation by States of Motor-vehicle Fuels Sold in National Parks*, 38 U.S. Op. Att'y Gen. 522 (1936); *Application of Federal and State Sales Taxes to Activities of Menominee Indian Mills*, 57 Interior Dec. 129 (1940).

6. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

7. *See* Robert E. Reigel & Robert G. Athearn, *America Moves West* 81, 88–89 (1964).

8. Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, § 702 (repealing laws related to homesteading, with the exception of those that applied to public lands in Alaska, which were to sunset ten years later).

9. Ray Allen Billington, *Westward Expansion: A History of the American Frontier* 611–12 (1967).

Act was to occupy the land and improve it.[10] With so liberal a policy of giving away the public domain, the government needed a means to mark out some portions that would not be turned into farms, mines, homesites, trade sites, and all the other categories of private ownership. Under the Northwest Ordinance and its Jeffersonian predecessor, land was to be reserved from sale (giving away land for free was Lincoln's subsequent innovation under the Homestead Act[11]) for such purposes as schools and transfer to Revolutionary War veterans.[12] Likewise, under the Morrill Land–Grant Act of 1862, lands were reserved from entry for various public purposes, such as schools.[13] Beginning in 1872 with Yellowstone, reservations from entry were made for parks.[14]

From the beginning of our nation, no public purpose for reserving lands from sale or entry was more important than reservations for the Indians, in the early days because of their military threat to the new republic, and subsequently as a matter of national honor.[15] As Felix Cohen put it, the most common Indian reservation legislation "is that which *reserves* a portion of the public domain from entry or sale and dedicates the reserved area to Indian use."[16] It would be highly inconvenient for the government as well as the Indians if squatters or purchasers took lands from the Indians. In the early days, that risked embroiling the government in Indian wars. Likewise it would be inconvenient if military bases could become squatters' homesteads. So both have been reserved from entry, and called "reservations" for that reason, since the earliest days of the Republic.

If there were any ambiguity in the Hayden–Cartwright Act reference to "reservations," which there is not, it would be cured decisively by the Act's reference to "licensed traders." The only federally "licensed traders" that exist, the only persons to whom the phrase applies, are those who trade with Indians in Indian country.[17] The majority suggests that the phrase could refer to "non-Indian traders licensed to conduct business on *any* federal reservation,"[18] but there is no instance of the phrase "licensed trader" used in federal law outside of trade with Indians. Traders on Indian reservations have always needed federal licenses. Before we were even the United States, colonial governments licensed traders dealing with the Indian tribes.[19] "In the very first volume of the federal statutes is found an Act, passed in 1790 by the first Congress, 'to regulate trade and intercourse with the Indian tribes,' requiring that Indian traders obtain a license from a federal official, and specifying in detail the conditions on which such licenses would be granted."[20]

10. Reigel & Athearn, *supra* note 7, at 420–21.

11. Riegel & Athearn, *supra* note 7, at 420.

12. Billington, *supra* note 9, at 216.

13. *Id.* at 702; Lawrence M. Friedman, *A History of American Law* 417 (1985).

14. Friedman, *supra* note 13, at 419.

15. Billington, *supra* note 9, at 703.

16. *Felix Cohen's Book of Federal Indian Law* 296 (photo. reprint 1942) (1986) (emphasis in original).

17. 25 U.S.C. § 261 et seq.; 25 C.F.R. 140.1–140.26 (licensed Indian traders).

18. Maj. Op. at 693.

19. Cohen, *supra* note 16, at 348.

20. *Warren Trading Post Co. v. Ariz. State Tax Comm'n,* 380 U.S. 685, 688, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (quoting Act of July 22, 1790, 1 Stat. 137).

Generally, it has been illegal for anyone but an Indian to live in Indian country or on an Indian reservation as a trader without a license, on pain of fine and forfeiture of all trade goods.[21] The purposes of licensing Indian traders have been obvious from the legal restrictions imposed from time to time on their trade: preventing sales to Indians in Indian country of whiskey and of means for making war, and protecting the Indians from exploitation.[22] Federal law still provides, with various exceptions and limitations, that "[a]ny person other than an Indian of the full blood who shall attempt to reside in the Indian country, or to trade therein, or on any Indian reservation as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians, or found in his possession, and shall moreover be liable to a penalty of $500."[23]

Without federal legislation to the contrary, such as the Act we are construing, these licensed traders cannot be taxed by the states.[24] "[F]rom the very first days of our government, the Federal Government had been permitting the Indians largely to govern themselves, free from state interference, and had exercised through statutes and treaties a sweeping and dominant control over persons who wished to trade with Indians and Indian tribes."[25] *Warren Trading Post* holds that assessment and collection of a state tax on gross proceeds of the Indian trader "would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress."[26]

The Hayden–Cartwright Act is just such an act of Congress, and its inclusion of "licensed traders" can mean only one thing, that Congress was acting pursuant to the "as authorized by Acts of Congress" language under *Warren Trading Post.* Since "licensed traders" is a phrase with only one meaning, persons licensed to trade on Indian reservations, Congress necessarily meant the unambiguous word "reservations" to apply, as it ordinarily does, to Indian reservations.

The only circuit authority the majority cites, *Marty Indian School Board v. South Dakota,*[27] is not on point. There the tax was on fuel purchased by an Indian school, and the Eighth Circuit decided the issue on preemption grounds, primarily relying on *White Mountain Apache Tribe.*[28] The Hayden–Cartwright Act was distinguished in an offhand remark at the end of the decision.[29] *Marty Indian School Board* would be relevant authority if the question before us were state tax on fuel sold to an Indian school or tribe, but it is not.

The language of the Hayden–Cartwright Act is "unmistakably clear," to the effect that "reservations" includes Indian reser-

21. Cohen, *supra* note 16, at 349.

22. *Id.* at 349–50.

23. 25 U.S.C. § 264.

24. *Warren Trading Post,* 380 U.S. at 690, 85 S.Ct. 1242.

25. *Id.* at 686–87, 85 S.Ct. 1242.

26. *Id.* at 691, 85 S.Ct. 1242.

27. *Marty Indian Sch. Bd. v. South Dakota,* 824 F.2d 684 (8th Cir.1987).

28. *Id.* at 686–88 (citing *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1979) (holding that federal regulation of timber preempted a state tax that would fall on the tribe and interfere with the congressional purpose of funding tribal government with timber sales)).

29. *Id.* at 688, 85 S.Ct. 1242.

vations. The express application of the Act to "licensed traders," which is to say, Indian traders on Indian reservations, eliminates any room for argument about what Congress said. About the only argument I can think for the Act not being "unmistakably clear" is that the majority today makes a mistake. That logical amusement is not a sufficient reason to set aside the plain and express decision of Congress.